[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On May 30, 1990, two years after being first placed in foster care, Nicole D. became the subject of this petition by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Collette D. and Nole K., her mother and putative father, alleging all four of the nonconsensual grounds to terminate parental rights as set forth. in Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1990; now 17a-112
Rev. 1991). Trial was continued to secure an updated psychiatric evaluation of mother and child by the same psychiatrist who had seen them in July of 1988.
On February 15, 1991, the day set for trial at an earlier pretrial conference, the mother's attorney was unable to participate. The matter was continued to March 15, 1991 and concluded on April 9, 1991. All parties waived the right to file trial memoranda, so the period of reserved decision is deemed to commence on April 9, 1991.
Facts
Evidence offered in two trial days, interpreted in the light of the prior record in this court concerning this child, CT Page 4785 supports the finding of the following facts:
Nicole D. was born September 3, 1982, shortly after her 28 year old mother had separated from her husband of eight years. The man named as her biological father, Nole K., has never acknowledged paternity or been adjudicated to be her father.
DCYS began receiving referrals when Nicole was five. During a routine medical appointment, Collette asked for her daughter to be tested for venereal disease, explaining her suspicion that the child had been molested by a neighbor. When told there would have to be an investigation of suspected child sexual abuse and a referral to DCYS, Collette withdrew her request for the blood test. In the next two months, two more referrals were received involving threats of violence by the mother, fires in her apartment, and involvement in drugs. When Collette was arrested in June of 1988 and refused to give permission to DCYS to place Nicole in foster care or to make any other plan for her care during her absence, a neglect petition was filed under Sec. 46b-129, and an order of temporary custody (O.T.C.) secured. Nicole has been in continuous foster care since June 9, 1988.
Following a contested hearing on the O.T.C., the order was sustained and a psychiatric evaluation with Dr. Richard Sadler ordered. Before the trial of the neglect case, Nicole's foster placement was changed due to the inability of the first foster parent to deal with Nicole's highly sexualized behaviors. Collette failed to appear at a continued trial date on December 8, 1988 when the child was found, by default, to be neglected and was committed to DCYS for an initial period of 18 months. In the mother's absence, but in the presence of her attorney, expectations were articulated as a guide to the eventual reunification of mother and child. The principal expectation was for Collette to enter inpatient psychiatric hospitalization for diagnosis and treatment, and thereafter to comply with any recommended outpatient care. This was based upon Dr. Sadler having found Collette to be ". . . an extremely emotionally disabled woman" with "seriously impaired judgment throughout all areas of her life . . . incapacitated by an intense affective disturbance as well as a disturbance of her thinking," lacking insight and demonstrating both threatening behavior and delusional thinking. (State's Exh. E., neglect trial, 12/5/88).
Nicole began therapy in October of 1988 focused on her problem of oppositional, aggressive and sexualized behavior. After a month of therapy, she began to disclose to her therapist, as well as to her foster mother and the DCYS social worker, circumstances that had existed in her home: She CT Page 4786 reported that her mother had dressed her up in her (mother's) clothing and jewelry, applied make-up and perfume, and "presented" her to a man known to her as "J.J." who sexually molested her, after which, with Nicole present, her mother would engage in sexual activity with the same man. (Testimony of C. Nolan and S. Fagan, 3/15/91). The consistency of her story, repeated over time to different professionals with no sign of having been coached, and the appropriate affect with which she told her story, convinced her counsellor that her story was true. Upon his recommendation, visits with her mother were suspended in December of 1988.
As the weeks passed without contact with her mother, Nicole began to show progress in therapy. She was able to disclose her feeling that her mother was unable to protect her from J.J. and expressed worry about her mother, hoping she would "get help" for her drug problem. Such concerns in a six-year old indicated her to be a "parentified" child, a condition that makes it impossible for the child to go through normal developmental stages into adulthood.
Four months later, without consulting the child's therapist, a new DCYS social worker arranged a visit that took place on April 28, 1989. Because unprepared for a visit before having ". . . fully worked through her personal issues concerning her feelings about her abuse", her therapist immediately noted "a very marked regression in her behavior." (Letter from Nolan, States's Exh. 5, p. 2.). Since her aggression and sexualized behaviors had reappeared and she was displaying "overpowering emotions" which preoccupied her thoughts (Id, p. 3), the therapist wrote to DCYS on May 15, 1989 recommending suspension of visitation until Nicole could work through these issues, and her mother could acknowledge that such abuse had occurred and take some responsibility for it. He recommended that Collette's engagement in psychotherapy be a condition precedent to any resumption of visitation. In a review in court shortly after, on June 13, 1989, the court ordered suspension of contact until the mother began compliance with those recommendations.
Notwithstanding the therapist's recommendations and the judicially sanctioned cessation of contact with her mother, the DCYS treatment plan for Nicole dated June 23, 1989 continued to be reunification with her mother in six months. Six months later, with visitation still suspended and Collette remaining uninvolved in any form of psychiatric treatment, the treatment plan had changed: A petition to terminate parental rights was to be filed in March of 1990. In March of 1990, however, the petition that was filed by DCYS in compliance with the requirement of subsection (e) of Sec. 46b-129 was not to terminate CT Page 4787 parental rights, but rather to continue Nicole's status as a state ward for another 18 months. By this time Collette's whereabouts had become known. Six weeks after such extension was granted by default on April 17, 1990, this action was instituted.
A physical examination performed after Nicole's first revelation of sexual abuse found the vaginal opening "very slightly enlarged for her age", consistent with sexual abuse. (Respondent's Exh. 1). When confronted with the child's story and these findings, Collette did not deny it had occurred, but claimed it could not have been "J.J." and took no personal responsibility. When urged by DCYS to engage in psychiatric treatment, she declined, claiming that she had been talking to "people" who said she should not do so. (Testimony of Fagan, 3/15/91).
Interviewing Collette more than two years after their first meeting in July of 1988, Dr. Sadler found her to be
 . . . a woman out of touch with ordinary reality and out of touch with her own behavior, appearance and functioning . . . her thinking was delusional and expressed a pervasively paranoid view of the world which was essentially the same thought content expressed by Ms. D. two years previously.
(State's Exh. A, p. 3).
With Dr. Sadler, Collette expressed doubt that Nicole had ever been sexually abused, although she implied that her teen-aged son might have done so or permitted others to do so. She was adamant that J.J., her boyfriend at the time, could not have been involved, denied that Nicole ever observed her in sexual activity, and "laughingly and sarcastically indicated that there was no way to tell from Nicole's vagina whether or not she had been abused." (Id., p. 4.) Admitting she had been "drinking heavy and dibbling and dabbling into a little caine"', Collette acknowledged entering an inpatient program at Blue Hills for 30 days, but denied the need for any psychiatric treatment:
 "I am not crazy and I know when a setup is a setup I know when you have been setup. I think someone told her to tell what to say. She has to tell what they want her to say. If she was being abused then how come she has no broken arms. It is not the truth."
(Collette quoted in State's Exh. A, p. 5.) Smiling broadly, CT Page 4788 Collette told Dr. Sadler that she believed someone wanted to kill her or her son, that "them boys on the avenue want to kill Tony [her son]. They wanted to give me AIDS" and later suggested that "someone at St. Francis wanted to give her AIDS". She did not indicate readiness to care or Nicole full time, wanting only to visit the child and suggesting that DCYS "might be taking money in order to keep them apart." (Id., p. 5.).
Dr. Sadler, finding Collette "essentially unchanged" from July of 1988, concluded that she was "embroiled in a paranoid delusional scheme which places her at odds with most of the people in her environment" and that Nicole had become a pawn in one of those schemes. Having received no psychiatric treatment, he found her "currently functioning in a psychotic manner", unable to consider her daughter's needs when conflicting with her own. He saw little chance that she would seek treatment in the future and therefore "no reason to expect any improvement in . . . functioning." (Id, p. 6.) Because he found the mother psychotic and unlikely to enter treatment, he recommended that reunification efforts cease and that Nicole be freed for adoption. Even lacking adoption, he recommended against resumption of visitation until Collette entered treatment, acknowledged abuse of her daughter and made amends for her own role in that abuse. Even if she entered treatment at once and were to be totally compliant, he would not recommend initiation of visiting for at least a year. (Testimony of 3/15/89). Even apart from the issue of sexual abuse, Dr. Sadler found Collette's psychotic condition rendered her incapable of caring for the child because of her inability to respond to the child's needs.
Testifying in her own behalf, Collette acknowledged maintaining contact with "J.J." In the nearly three years since Nicole's removal, she had obtained housing and had been working at a Workfare job for two years. She claimed when she went to Blue Hills for treatment, "they only let me stay eight days." (Testimony of 4/9/91.) She testified that she then began seeing someone on an outpatient basis, but after a couple of sessions, when told she could still not start visiting Nicole, she stopped. She admitted being given a list of treatment facilities in December of 1989, but did not make contact with any of them until March of 1991. She said she had stopped drugs two years before: "I'm better now. Drinking and getting high. Sometimes now I'm like that but mostly I'm better." She was content to leave Nicole in the foster home where she is "all right and happy", although expressing the hope some day to get her back: "Maybe I'll get lucky and get another husband." Throughout her testimony, Collette displayed the same behavior noted by Dr. Sadler, of smiling and laughing while giving testimony relating to Nicole's past abuse. CT Page 4789
No testimony was offered as to any contact by the named putative father.
Adjudication — no facts as of the date of filing (5/30/90)
The salient facts in this case, which remained unchanged from the date of filing to the date of disposition 10 months later, provide clear and convincing proof of three of the four grounds pleaded for terminating the parental rights of Collette D. and Nole K.
1) Failure to rehabilitate: From the date of commitment on December 5, 1988, even before the revelations of sexual abuse, the principal expectations for Collette before reunification could be considered was inpatient psychiatric treatment and consistent follow-up of recommendations thereafter. After the revelation and the consequent suspension of visitation, this expectation was repeatedly communicated to the mother. She denied need for such treatment and failed to engage in it. Because of her continuing psychosis that renders her out of touch with reality and unresponsive to her daughter's needs, she was no closer in May of 1990 to being able to care for this child than she was two years before when Nicole was initially placed. This constitutes clear and convincing proof of the failure to ". . . achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a reasonable position in the life of the child."
2) Acts of omission or commission: Acts of neglect known to the court at the time a child is committed to DCYS, as was Nicole in 1988, must be considered as underlying the adjudication of neglect which empowers the court to order such commitment. These known acts, in fairness, may not be called upon to do "double duty" years later as grounds to terminate a parent's rights. But such acts which only come to light after a commitment may be deemed available for a subsequent petition to terminate parental rights since, had they been known prior to commitment, they could have been used for the filing of coterminous petitions of neglect and termination of parental rights under subsection (e) of Sec. 17-43a. Collette's "preparing" her then five-year old daughter for sexual activity with her own boyfriend, "J.J.", and then participating in such activity herself in the presence of her child, constitutes a denial "by reason of an act or acts of parental commission or omission, [of] the care, guidance or control necessary for . . . [her] physical, educational, moral or emotional well-being." Two qualified professionals found the child's recounting of such CT Page 4790 experiences, revealed only after placement in the safety of foster care, believable; Collette never denied that such activities had taken place but rather denied that it was J.J., suggested it was her son, suspected a plot by neighbors, etc. This history, taken as a whole, constitutes clear and convincing proof that Nicole was denied by her mother's acts of commission the care necessary for her moral and emotional well-being 3) No on-going parent-child relationship. In May of 1990 when this action was instituted, Nicole had seen her mother only once in seventeen months (4/28/89) and that single encounter had caused her to lose many of the therapeutic gains she had made in the four preceding months during which such contact was suspended. While the earlier observed interaction between Collette and Nicole had seemed appropriate, once the child felt secure enough to reveal the role in which she had been cast by her mother, continued contact was deemed detrimental to the child both by her therapist, who had been seeing her continually for nearly two years, and by the psychiatrist who had evaluated the case twice in those two years. Whatever memories and emotional ties this child still has with her mother are of sexual victimization, fear of bizarre behavior, and worry about her drug problem; nothing suggests that there survives — indeed, if it ever existed — between mother and daughter any suggestion of a ". . . relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and education needs of the child." In re Juvenile Appeal (84-6) 2 Conn. App. 705, 709-19 (1984). Indeed, this history suggests that Nicole, at five, was helping to meet the emotional and sexual needs of the mother. Given Collette's refusal to engage in psychiatric treatment, or to acknowledge any need to do so, the likelihood of any change that would permit reintroduction of mother to daughter without serious harm to the latter is very poor, according to the psychiatrist who examined Collette in 1988 and again in 1990. This constitutes clear and convincing proof not only that there is no ongoing parent-child relationship between Collette and her daughter, as defined in subsection (b) of Sec. 17-43a, but also that ". . . to allow further time for the . . . reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The petitioner offered no evidence that Collette has abandoned her daughter. The absence of contact with her daughter was at the discretion of DCYS, dictated by the child's therapist and based upon behavioral evidence of the detrimental effect upon the child of such contact. Consequently this ground or terminating Collette's parental rights is dismissed.
Nole K. having been absent from Nicole's life since 1988, has clearly abandoned the child. This fact also supports the CT Page 4791 finding of failure to rehabilitate and absence of parent-child relationship.
Disposition — on facts as of 4/9/91, the last day of trial.
In the more than ten months between the filing of this petition and the final trial date, no change took place in the situations of the parties except that Nicole continued to progress in therapy and in her tie to her foster family. Collette remains psychotic and involved in no treatment. The recommendations of both therapist and evaluator were unequivocal and unrefuted by any other evidence in this record.
Before the court may consider terminating a parent's rights, however, the six factors set forth in subsection (d) of Sec. 7-43a must be considered:
(1) No services could be offered to Collette to facilitate reunion with Nicole except to urge the mother to enter psychiatric inpatient treatment for evaluation and initiation of treatment for her psychosis. DCYS did this often, and, as recently as five months before filing this petition, gave her a list of resources which she ignored until March of 1991 — ten months after this petition was initiated. Visitation was facilitated until it was recommended to be suspended because of the child's revelations and the detrimental effects of continued contacts with Collette. Under these circumstances, no other services could be appropriately offered.
(2) The only orders imposed by this court were for court appearances and cooperation with the clinical evaluation. Collette complied with these except for her failure to keep half of the scheduled appointments with Dr. Sadler. While not orders, the expections of the court have been complied with in all but the most essential requirement: Obtaining of housing and income, and the avoidance of drug abuse and crime, cannot bring about reunification with an untreated psychotic parent. Collette's failure to acknowledge the need for psychiatric treatment or to engage in any form of relevant treatment is a failure of the most critical expectation.
(3) Nicole's feelings and emotional ties with her mother were graphically documented by her therapist following the unrecommended visit in April of 1989. Nicole worries about her mother's drug use, feels that she was unprotected by her mother from sexual assault by her mother's boyfriend, and regresses emotionally when confronted with her mother. On the other hand, she has bonded with foster parents who have voiced their permanent commitment to her and in whose care she has made significant progress. CT Page 4792
(4) At eight years of age, Nicole has been a foster child for the last one-third of her life. When she last lived with her mother she was five, and her present memories of that time consist of worry about her mother, resentment that her mother would not protect her from sexual molestation, and memories of her mother's bizarre behaviors that led to her emergency placement almost three years ago. She needs the assurance of permanency in a safe and nurturing environment without further delay, before she enters the turbulent years of puberty and adolescence.
(5) Collette has made no effort to adjust her circumstances, conduct or conditions to make it in the best interest of Nicole to return to her home in the foreseeable future. While her whereabouts are no longer unknown and she has secured appropriate housing, she has not addressed her psychiatric condition that precipitated her child's placement in the first place: She neither acknowledges the need for psychiatric care nor has embarked on any form of such care. As a result, she is as psychiatrically disabled and as incapable of child care in 1990 as she was when first seen by the psychiatrist in July of 1988.
(6) Collette was prevented from maintaining a meaningful relationship with Nicole by the barring of visitation, but this was not an unreasonable act on the part of DCYS in light of the child's problems and progress in therapy. In fact, it was an unreasonable act on the part of DCYS on April 28, 1989 when Nicole was required to visit with her mother without the knowledge of her therapist. The results were clearly negative to the child, causing her to lose much of the gains she had made in the previous four months of therapy.
Therefore, it is ORDERED that the parental rights of Collette D. and Noel K. in and to the child Nicole D. be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of implementing a permanent plan for the child's care, and that such Commissioner shall file with this court within 90 days of the date of this judgment a written report as to the progress toward such a plan. If Nicole is not then adopted, such Commissioner is further ORDERED to file by September 1, 1992 a motion for Review of Plan for Terminated Child to be in conformity with federal law.
Appeal
Collette has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial CT Page 4793 counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity the court will appoint him for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 20th day of May, 1991.
Brenneman, J.