[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
FACTS
By a petition filed March 23, 1992, the Commissioner of the Department of Children and Youth Services (hereinafter referred to as DCYS) sought to terminate the parental rights of Roseanne G. and Joseph W. The latter is now deceased and the petition proceeded only as to the respondent Roseanne G. The CT Page 4560 minor child, Roseanne W., had previously been committed to DCYS and the petition was filed pursuant to Section 17a-112 of the Connecticut General Statutes.
Trial of this matter took four days, December 7 and 8, 1992 and January 7 and 11, 1993. Briefs were filed on March 9, 1993.
In the course of the trial, the court heard the child, her therapist, two clinical psychologists, the foster mother, two social workers, the respondent and her mother.
Roseanne W. was born on April 25, 1981 to Roseanne G. and Joseph W. In 1986, Joseph W. was arrested on risk of injury and sexual assault charges relating to this minor child and her brother. The charges were nolled in June because Roseanne G. had not kept in touch with the prosecutor's office and the prosecutor could not find the mother or the children when the case was reached for trial.
In October of 1988, the respondent mother was arrested on a drug charge and had the minor child with her at the time. She then called Joseph W. from whom she was now divorced and asked him to take both children overnight. A few days later, she voluntarily transferred custody to him. When she sought to regain custody, Joseph W. refused to return the children and DCYS was called when the New Haven State's Attorney learned the children were with their father.
Roseanne W.'s commitment in November of 1988 was marked by problems from the onset. Her first placement was not successful and she was soon admitted to High Meadows where it became obvious that this child had serious problems.
A family evaluation was ordered in January of 1989 and Dr. Alan Shulik (who testified at the trial) recommended residential placement or specialized care. He diagnosed Roseanne W. as having a "severe adjustment order with mixed disturbances of emotions and conduct."
The child was next placed with Mr. and Mrs. B. in April of 1989. It is hard to believe that the child who appeared and testified in the trial is the same child who was placed with the B. family. In April of 1989, Roseanne was eight years old and weighed 130 pounds. She was a behavioral problem and was deeply troubled. During this period, her CT Page 4561 contacts with her mother were producing disastrous results. Apparently the mother was encouraging the child to intercede with DCYS to obtain more visits and telephone calls. The child's response was to urinate on herself while on the telephone and to approach a "state of shock." After a telephone call from her mother, the child would be belligerent and self-destructive, inflicting horrible injuries on herself.
Early in this placement, Monica Hien, a clinical social worker, became Roseanne's therapist. Initially, she saw the child weekly. Ms. Hien eventually recommended that all contacts with the mother cease because of the regressive and destructive behavior which she felt preceded and followed each contact. This was contrary to Dr. Shulik's recommendation, which was that there be increased contact with both parents.
DCYS decided to follow Ms. Hien's recommendation and in December 1990 contacts between mother and daughter were suspended. This met with the child's approval and she stated that she would see her mother only if she had to.
It is this cessation of contact that the respondent Roseanne G. complains of in her opposition to the petition, alleging, in effect, that DCYS prevented her from reuniting with her daughter.
 I.
Section 17a-112(b) of the General Statutes reads as follows:
 The superior court . . . may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not he less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the CT Page 4562 age and needs of the child, they could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental omission or omission sufficient for the termination of parental rights; or (4) the is no on-going parent/child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child.
DCYS has proceeded on Sections 1, 2 and 4 of this subsection. The court does not find Section 1, abandonment, has been proven by the petitioner, at least as this court perceives the case law treating with this grounds for termination.
 II.
DCYS next claims that the respondent mother has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time. . ." she could assume a responsible position in the life of the child.
The respondent denies this allegation and cites her involvement in therapy, her stable life style, and remarriage. Evidence concerning her treatment is somewhat unclear. While the respondent claims a steady and successful course of recovery, her discharge summary is puzzling. The reason for termination is given as "by mutual agreement that issues had been resolved as far as possible at this time." This was preceded by, first, a period at the Connecticut Mental Health Center (CMHC), followed by an interval with Catholic Family Service.
DCYS reported that she left CMHC because she was unhappy with a counselor, and the respondent agreed with this. Apparently, she never actually started treatment with Family Services and there was a gap of several months (December 1989 to April 1990) before she started at Meriden-Wallingford Hospital CT Page 4563 from where she was discharged as stated above.
Admittedly, the respondent has led a more stable and responsible existence since DCYS intervened. However, when one examines the total picture, it becomes painfully clear that this respondent sees her rehabilitation in a superficial way. To appreciate her shortcomings at the personal rehabilitation that would enable her to assume a responsible position in this child's life, it is necessary to examine what had been inflicted on this child up to the date of first commitment, November 2, 1988.
Roseanne W. was born April 25, 1981. Her parents were divorced in 1984 after a most unpleasant and unstable marriage. The physical and emotional upheavals continued as the respondent moved to Massachusetts, Maine, back to Connecticut where she had at least two addresses, then back to Maine and finally back to Connecticut. This moving about was occasioned in part by financial problems.
In 1986, the natural father of this child was arrested on sexual assault and risk of injury charges involving her and her brother. Thus, the respondent's actions in 1988 in placing the children with their father is both indefensible and abhorrent. It is significant that the respondent believed the father was guilty of the 1986 charges, yet she returned Roseanne W. to her alleged abuser upon her arrest and then formally transferred custody to him through the Probate Court.
What the court perceives as a continuing display of parental irresponsibility continued during the commitment and up to the time DCYS filed the petition to terminate her parental rights. When retrieved by DCYS in November of 1988, Roseanne W. was a seriously disturbed child with specialized needs, necessitating her placement in a facility tailored to meet such needs. Her therapist described her as one of the most disturbed children she had ever seen.
In this setting, with the child now seven-and-a-half-years old and showing signs of self-mutilation, the respondent was seen by the child's therapist as "needy and overemotional." The respondent and the natural father now competed for visitation. During visits with the child, the respondent openly displayed her anxiety and cried frequently. This further upset the child so that she began to resist contacts with her mother and respond in numerous unpleasant ways which the court is reluctant to repeat CT Page 4564 in this opinion. Attempts by the child's social worker and therapist to address the respondent's behavior and to prepare her for the long-term process of assisting the child's recovery were unsuccessful. In fact, things went so poorly, that it became necessary or the child to have therapy after every visit with the respondent.
As for the assertion that DCYS did nothing to assist the respondent's rehabilitation and prevented visitation, there is overwhelming evidence to the contrary. Evaluations were obtained, service agreements executed, and visits scheduled to accommodate the respondent. In addition, DCYS interceded with the respondent's employer, contacted therapists, and set up meetings in preparation or the visits with the child. Attempts were made to prepare the child as well and DCYS handled transportation and all other arrangements.
While the respondent made an effort in some areas, she was quick to resort to excuses and evasion — a symptom one worker felt indicated drug use. DCYS never got the results of the respondent's drug evaluation. Finally, the visitation was terminated only when the child's therapist indicated that the child's symptoms worsened before and after every visit and that this was having a harmful effect which was jeopardizing the child's chances of recovering.
It is the conclusion of the court that there is clear and convincing evidence that the respondent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of Roseanne W.
 III.
The petitioner has also claimed that there is no on-going parent/child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral, and educational needs of the child and to allow further time or the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. (Sec. 17a-112(b)(4), supra).
This subsection indicates a two-step determination must be CT Page 4565 made, the first being "whether the child has no present memories or feelings for the natural parent." In re Juvenile Appeals (84-6), 2 Conn. App. 705, 709 (1984). (Additional citations omitted.)
On this subject the court heard from Margaret Hartman, DCYS social worker; the child's therapist, Monica Hien; Dr. David Mantell, clinical psychologist appointed to do a court evaluation; and the child herself.
The child recounted no pleasant memories of the time she spent with her mother, rather, her memories were of the unpleasant — the respondent yelling and filthy living conditions. These memories were related to Dr. Mantell and Ms. Hartman. Ms. Hartman also observed the lack of warmth in contacts between mother and daughter. Ms. Hien noted a lack of parental bonding and the child's failure to ever express a need for or a desire to see her mother. She felt the respondent was the source of the child's anxiety and ascertained no positive memories of the respondent by the child.
The court concludes that this child has no present memories or feelings for the respondent, her natural mother.
Turning to the second part of the required analysis, the court finds the evidence is overwhelming that to allow time for the establishment of a parent/child relationship would be not only detrimental to this child but also disastrous.
Listening to and observing this child testify was a salutory experience in itself. (The child requested through her attorney that she be permitted to address the court.) This, coupled with the testimony of Dr. Mantell and Ms. Hien, compels the court's conclusion.
As part of his court evaluation of Roseanne W. and the mother-daughter relationship, Dr. Mantell spent some seven or eight hours and had psychological tests done. He found the child to have specialized needs caused by her early life and concluded that the respondent cannot meet those needs. He felt there is no relationship between mother and daughter and to continue efforts to have the child bond with her mother would be a hardship the child could not tolerate. She would perceive this as a threat to her present stable existence, great stress would be exerted on her, and her earlier problems would be re-activated. The result CT Page 4566 would be a mental breakdown and hospitalization.
He also stated his opinion that the child is happy with her foster parents who have given her security and affection. Her adoption by them would be in her best interests. Ms. Hien's observations closely parallel those of Dr. Mantell. She felt that Roseanne W. was overwhelmed by her mother, feared her, and was unduly burdened by her mother's emotional behavior. She also found that the child had bonded with her foster parents and felt herself part of their family. Any loss of ties with her foster parents would be disastrous and she would expect the child to "fall apart."
Both of these experts found the respondent to be the child's problem — both feel she cannot be of comfort to Roseanne. Dr. Mantell stated that this respondent recognizes the lack of a bond with the child and the existence of strong bonds with the foster parents. He further stated the respondent is opposing this petition "to enhance her own image, knowing it would be disastrous for Roseanne to be removed."
 IV.
Counsel for the petitioner has cited In re Megan M., 24 Conn. App. 338
(1991) to support its claims. In that case, termination was effected because there was no ongoing parent/child relationship. The mother had been completely rehabilitated. Yet, the court was swayed by the child's resistance to attempts to reunite her with her mother. This resistance was manifested in many of the same ways Roseanne W. reacted to her mother's contacts. The decision was motivated by the harmful effect on the child and not by the unfortunate result visited upon the rehabilitated parent. This case is similar. This child has just become 12 years of age. Her first seven years of life were a tragedy. It took the foster parents and therapists until 1991 to get her approaching a normal existence. It defies logic, human nature, and the bounds of compassion to suggest she has had her two years of pleasure and it is now time to return her to the mother with whom she associates the condition she was in when she had to go to High Meadows in 1988. The foster parents have seen this child through some trying times. The court is amazed at the improvement in her mental and physical condition. Releasing her for adoption is a decision the court is compelled to make.
V. CT Page 4567
Pursuant to Sec. 17a-112(d), the court makes the following findings:
1. DCYS had a family evaluation performed and provided extensive mental health services to the child. The mother was referred to appropriate agencies. After the child's placement, DCYS worked with the child, the mother, the foster parents, and the child's therapist to coordinate telephone contacts and visits. The petitioner also interceded with the respondent's employer, provided travel, and monitored the relationship between mother and child.
2. While the respondent mother has participated in all court ordered evaluations, the court does not find she cooperated in the DCYS attempts to have her bond with her child.
3. No parent/child relationship exists between Roseanne W. and the respondent, whereas the child recognizes the foster parents as her parents and wants to be adopted by them. No present positive memories of her mother exist.
4. Roseanne was born on April 25, 1981.
5. As noted above, the respondent's efforts to adjust her circumstances, while considerable, have not addressed her relationship with her daughter. Because of her effect on Roseanne, it is not in the best interest of the child to return her to her mother and it is not likely that condition will ever change.
6. The court finds that the respondent has not been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the now-deceased father or the unreasonable act of any other person, nor by her economic circumstances.
 VI.
The petitioner, having presented clear and convincing evidence to support the granting of the petition, the court finds the best interest of the child will be served by a termination of the parental rights of Roseanne G.
Rose Alma Senatore, Commissioner of the Department of CT Page 4568 Children and Youth Services, is appointed statutory parent of Roseanne W. for the purpose of effecting her adoption.
Anthony V. DeMayo, Judge