MEMORANDUM OF DECISION
(AMENDED)
This case presents a petition for the termination of the parental rights of Gemma N., and of Pascacio R. Sr., who are the biological patents of the minor children, Pascacio (his father, by the same name, will be referred to as Sr.), born Feb. 19, 1989, Loumania, born Feb. 14, 1990, Josenia, born April 2, 1991 and Gemma R., born Feb. 18, 1993.
The court finds that the mother and father have appeared and have court appointed attorneys. Mother has had a guardian as litem appointed for her. These cases have been pending in the court system since March 19, 1993. The court has jurisdiction in this matter; there is no pending action affecting custody of the children in any other court and reasonable efforts have been made to reunite the children with their parents.
The court having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and evaluators, makes the following findings by clear and convincing evidence.
With Respect to the Children's Father: (Pascacio R. Sr.)
The father has not supported the children, nor has he had any physical involvement, nor has he demonstrated any active interest in the children since his incarceration in November of 1993. Prior to the DCF intervening with this family, the father had been living in the home with the mother and children. While he was in the home he acted in a paternal role, baby sat for the CT Page 9507 children, was a part-time provider and was ". . the other parent in the home." He was also a substance abuser, domestically abusive and criminally active.
Once the children were removed from the home on September 7, 1993, he occasionally visited the children with the mother. In November of 1993 he was incarcerated and has remained incarcerated ever since. During his incarceration he did not seek visitation with the four children until the petition was brought to terminate his parental rights in July, 1995.
Pascacio R. Sr.'s ". . . imprisonment hardly complicates the issue". In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431,443, 446 A.2d 808 (1982); In re Juvenile Appeal (84-6)2 Conn. App. 705, 711, 483 A.2d 1101 (1984) cert. denied, 195 Conn. 801,487 A.2d 564 (1985). The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In re Juvenile Appeal (Docket No. 10155), supra In Re Shannon S., 41 Conn. Sup. 145, 153,562 A.2d 79 (1989). Some of the obligations of parenthood can be pursued, even from prison. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; . . . . and (5) the duty to furnish social and religious guidance." In re Juvenile Appeal (Docket 9489), 183 Conn. 11, 15,438 A.2d 801 (1981) quoting In re Adoption of Webb, 14 Wash. App. 651,657, 544 P.2d 130 (1975). This court finds that the father took no action, in a parental role, to maintain a relationship with his children; he did not visit them, he did not communicate with them; he did not provide guidance; he did not express love or concern. his efforts which did occur were late and ineffectual as far as his relationship with his children is concerned.
The court is mindful of the many courses the respondent has completed while incarcerated. (Fathers Exhibits AAA and BBB) Those courses, hopefully, will lead to his personal rehabilitation. They have not impacted upon his failure to communicate or relate to these four children. The children have no relationship with him, nor he with them. His failure to maintain a relationship, correspond by phone or in writing, or seek visitation, all taken together compel the court to find that his prison activities were motivated toward personal rehabilitation and not toward parental rehabilitation. The CT Page 9508 respondent-father lacks the judgment, insight, motivation and understanding of his children's needs to act as a parent. The court finds that the children have been in foster care for four years and that any further delay would be unreasonable. In ReChristina V., 38 Conn. App. 214, 221, 660 A.2d 863 (1995).
The court finds by clear and convincing evidence that the children have previously been adjudicated neglected and the father has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, such parent could assume a responsible position in the life of the child. General Statutes 17a-112 (c)(3)(B). This ground has existed for more than one year.
With Respect to the Children's Mother:
Gemma, the children's mother, is 33 years of age. She reports that her father has a history of alcoholism and that her mother had a history of depression and multiple suicide attempts. She experienced major behavioral difficulties as an adolescent herself. She was hospitalized in an adolescent psychiatric unit and placed in a group home for girls. She became pregnant with her first child as a runaway. She reportedly finished nine years of education.
Gemma has had nine children by four fathers, all, but one, out of wedlock. Her first four were removed from her and her parental rights to them has been terminated. Four more of her children are the subject of this petition. Gemma attended court for most of the various days of this hearing with a ninth child by another paternity; an infant whom she carried, inappropriately, to court.
The mother admits to having been on drugs during her pregnancy with the child Gemma R.; she had failed to obtain prenatal care and had used cocaine during her pregnancy. The children's father, Pascacio, was using and selling cocaine and was arrested for possession with intent to sell. Gemma R., the youngest of these children, was diagnosed with cerebral palsy and DCF determined that the parents were unable to care for the children. Gemma, in her testimony, conceded that DCF had appropriately intervened in 1993. She maintains, however, that she has subsequently embraced the Jehovah's Witness religion; she is a Christian; she is no longer using drugs; she loves her CT Page 9509 children and believes they should be returned.
DCF describes the reasons for the petition as follows:
"Gemma F[2] is impaired in her parental functioning. There (sic) difficulties are very (long?) term and are resistant to change. Her disabilities prevent her from accepting services which might assist her in improving her life situation. These disabilities include borderline to low average intellectual abilities, poor planning and organizational abilities. Her problem solving skills are limited by the need for immediate gratification. She displays poor judgment and insight in the need for treatment. She has difficulty considering the needs of others and little ability to empathize with others. She has a low frustration tolerance and tends to disregard social rules . . . . These difficulties prevent her from providing a minimal level of physical and emotional care for her children now and in the foreseeable future." (Petitioner's Exhibit 2)
A neuropsychologist testified that she recently evaluated Gemma in January, 1997. The doctor confirmed the evaluation of DCF. Gemma indicated to the psychologist that she was then separated from her current husband "for a short period," the husband she had married in June of 1996 and whom, presumably is the father of her present infant child. She minimizes the fact that her husband is spending 3 days per week with his ex-wife and states he will return shortly. (Petitioner's exhibit 12).
(Gemma's). characterological makeup of narcissistic, dependent qualities, self-centered motivation, poor insight, rigid thinking, poor planning all contribute to very limited problem solving skills and care-taking capacities. Denial, rationalization, obstinacy, distrust and childlike magical thinking contribute to tendency to compromise her sense of values, morals and capacity to adult responsibilities. The characterological traits are permanent qualities that contribute to life-long difficulties in her interpersonal relations and decisions marked by poor judgment. Through the years she has not initiated substantial contact or made efforts to have meaningful experiences with the children. While she states to hold deep feeling for her children, and she feels her children love her, she has not been able to extend the need for her children into a plan of action reflecting adult insight and judgment e.g. marries a man with a drug addiction history, has another child, has not secured employment, has not adhered to a rehabilitation plan, has CT Page 9510 not secured more hours of time with the children." Exhibit 12 p. 5.
The doctor testified in court that in her considered opinion, Gemma would not be able to parent these children with their special needs, even with 24 hour assistance. "You would need an alternate parent, she is such a poor parent. 24 hour assistance is an impractical plan."
A second court appointed clinical psychologist further reinforced this forecast. This assistant clinical professor of psychiatry indicated in his testimony that the four children present with a variety of problems that are improved through the strength of their foster care attachments. The children are still insecure, are immature, self involved and have developmental problems. Gemma doesn't have any understanding of these problems, doesn't understand adult parenting, and doesn't relate well to the children, according to the psychologist. For example, during her interactional evaluation with the children present she "promptly lost control of the younger children, she became upset telling the children that she was their mother, that the women downstairs were not their mothers, she alienated the children since they didn't understand that she was there mother and then "she made bible studies of her present religion as the center of her interaction with the children, and she lost the opportunity to have a pleasant visit with them" and to learn more about her children. "Her poor judgment is of such a magnitude that she could not effectively parent these children, the children are not connected to her, . . . she doesn't think she has a problem, . . she is not a bad person but she is a very limited person."
A Catholic Services social worker who has worked with Gemma for over two years and has been her primary case worker for the past six months testified. She reports that Gemma, who lives in a federally aided apartment, has allowed persons to use drugs in her apartment, she frequently runs out of food and infant formula, owes substantial sums to the utility companies and, further Gemma says that people steal the food and baby clothing from her apartment and that she suspects that her husband who is in jail, has given out the key to her apartment. The social worker further reports that she misses 50% of her appointments, "she doesn't seem to consider them very important."
The court further observes that her conduct in court reflected her extremely poor planning and poor parental CT Page 9511 judgment.[3] The first day of trial was set for June 9, 1997. The court date had been set more than two months in advance. Her attorney reported that Gemma was on an oral medication known as Neoproxin, she was unable to concentrate, she had child care problems and she wasn't coming to court. The case was postponed to the following day. On June 10, 1997 she came to court with an infant. Her attorney asked that they be permitted to observe the proceedings from a room where she could observe and hear the proceedings. The court granted her permission. Gemma thereafter refused to stay in the court or in the observation room, preferring to walk around in the public corridor outside the courtroom
Her attorney and guardian ad litem reported that they had each advised her of her right to be present and her need to assist them with the defense. Over the course of the trial she would come in and depart at her whim, never staying long in the court even when the infant was quiet or asleep. On the final day of trial Gemma elected to testify over the objection of her lawyer and her guardian ad litem. Even on that day she made no provision for child care. The child was acting as a typical infant, fussy, crying, disruptive and distracting to the witness and the court. The court finds that her failure to follow the advise of her attorney and her failure to secure child care for her child are further indications of her lack of appropriate adult judgment and parenting skill.
Gemma concluded her testimony by indicating that she didn't blame DCF for taking away her children but that now she is "clean" because of her religion. She wants to "bring them into the truth, not celebrating and cutting off John the Babtist' head, and birthday presents, why do I have to wait a year to give my child presents, don't condemn me, don't persecute me, don't cast the first stone. The bible says everyone is imperfect and that's what I want for my children, I want my kids to be full of love, not hate, and walk in faith."
Adjudication
With respect to the statutory grounds for termination of parental rights of the mother and father, the court finds by clear and convincing evidence that the children have previously been adjudicated neglected and the mother and father have failed to achieve such degree of personal rehabilitation as would encourage the belief that with a reasonable time considering the CT Page 9512 age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes17a-112 (c)(3)(B). The court finds that these grounds have existed for more than one year.
The court makes the following factual findings required by17a-112 (e):
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, transportation assistance, and visitation coordination.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unable, due to his incarceration and desire not to have visitation to benefit from reunification efforts. Mother's inability or unwillingness to address her multitude of personal problems, has prevented successful reunification efforts.
3) The Department, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. There was only marginal compliance or participation by the parents. (See "Potential For Remediation", Petitioner's exhibit 12)
4) The children have strong emotional ties with the foster families who have provided the physical, emotional and educational support these children need. The children have little or no positive emotional ties to the biological father. The children have only a visiting relationship with mother, not a parental relationship.
5) Finding regarding the age of the children. Pascacio, Loumania, Josena and Gemma R., are 8, 7, 6 and 4 respectively. These children require stability of placement and continuity of care.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not made realistic and sustained efforts to conform their conduct to acceptable parental standards. Mother requires extensive therapy to deal with her parental failings and personal psychiatric difficulties. While father has been incarcerated he has, to his credit, completed various program offered for his personal CT Page 9513 rehabilitation. His failure to maintain a relationship with his children has displaced him as a possible parental figure. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C.210 Conn. 157 (1989); In re Juvenile Appeal 183 Conn. 11,15 (1981)
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. The substance abuse and criminal behavior of the father has resulted in his present arrest and incarceration. He elected not to visit with the children until after the children became settled in their foster placement and DCF initiated this petition. The Department initially attempted to encourage contact. No unreasonable conduct is noted. The mother has had regular visitation with the children.
DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parental rights of Pascacio and Gemma at this time. This finding is made after considering the children's sense of time, their need for a secure and permanent environment, the relationship that the children have with their foster parents, and the totality of circumstances that the termination of parental rights is in the children's best interest. In reJuvenile Appeal (Anonymous), supra, 177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the BestInterests of the Child 99 (1979).
Based upon the foregoing, findings, the court determines that it is in the children's best interest for a termination of parental rights to enter with respect to the biological parents, Pascacio R. Sr., and Gemma N. It is accordingly, ORDERED that the parental rights of Pascacio R. Sr., and Gemma N are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Francis J. Foley, Presiding Judge Child Protection Session