Memorandum of Decision
I. Procedural History
This is an action for Termination of Parental Rights brought by the children's mother Lisa S., to the Probate Court for the District of Newington. From the decree of the Hon. Sheila M. Hennessey, Judge of Probate, the respondent father, Steven A., appealed for a trial de novo to the Superior Court for Juvenile Matters. The case was thereafter referred to the Child Protection Session of the Superior Court for Juvenile Matters and was assigned for trial on December 3-5, 1997. The parties appeared with counsel and were at issue. The court heard the testimony of the petitioner, Lisa S.; her father in law; her husband; and a friend Christine Kelly. Further testimony was given by a DCF worker who had written his first Social Study; Dr. Robert Meier, a clinical psychologist; the vice president of operations for Steven's employer; Anthony Sullo, a friend of the respondent; the respondent's mother; the respondent's present girlfriend; and CT Page 13868 Steven A., who is the respondent. The court received various documents into evidence, which it has thoroughly reviewed. Based upon the testimony and documents in evidence, the court makes the following findings by clear and convincing evidence.
II. Findings of Fact
The Petitioner, Lisa S., is the female biological parent of two children, Alyssa, born on July 17, 1989, and Stephanie, born February 4, 1993. Lisa S. herself, now age twenty five, was born on June 24, 1972. The respondent, Steven A., is the male biological parent of these children. He was born on December 6, 1968. He is presently twenty-nine years of age.
On March 1, 1989, Steven, the respondent, then age 20, and Lisa, the petitioner, then age sixteen, were married. She was five months pregnant. She knew Steven sold drugs. They moved quite a few times for various reasons. Steven kept late hours, leaving in the afternoon and returning in the early morning hours. Lisa took care of Alyssa and relied on Steven to babysit in the morning while she attended a community college. On one occasion she came home to find him and his friends asleep and the child crying in the crib. She quit her efforts to continue her education. On January 30, 1991, Steven was arrested for possession of cocaine and possession with intent to sell. Alyssa was eighteen months old. While out on bond Steven was arrested again for selling hallucinogenic or narcotic substances and was immediately incarcerated. He was sentenced to 56 months in jail.
When Steven went to prison, Lisa would take the young child Alyssa with her when she went to visit Steven in prison. Lisa worked two jobs to support herself and the child. She provided the full time care for her child with no help from Steven. He was released on March 22, 1992.
Steven and Lisa resumed their marital relationship. She thought they would have a conventional relationship, that he would work regular hours, be home for supper and help her care for the child. She continued working herself. She became pregnant. Steven worked a couple of entry level jobs, loosing them for a variety of reasons. He had a job at ITT in Hartford as a janitor; he quit. They separated and he moved in with his friend Tony Sullo. Stephanie was born and they got back together in March, 1993, according to Steven. They moved back in with Lisa's family and within two months, they separated for good. CT Page 13869
Lisa filed for a dissolution of the marriage in July, 1993. In August, the court (Norko, J.) ordered Steven to pay $50 per week per child. On November 15, 1993, at the final hearing on the dissolution of marriage, Lisa told Judge Cohen, that she had been paid only $40 by Steven since the pendente lite order had entered. Lisa testified that she had always worked and had not received any state assistance. Steven, who had been subpoenaed to appear, told the judge that he was no longer working as of a week before the divorce hearing. He said he had no records of payments to his wife but that he had paid more than $40. Judge Cohen found the arrears to be $1260, ordered him to have visitation only upon application to the court for a visitation order, and continued the weekly support payments in the amount of $100 per week for the two children.
The decree was entered on November 15, 1993. Steven got the idea that it was better to have receipts for his support payments. He made a $30 payment by check on November 20, 1993, and a $30 payment by check on the following week, November 27, 1993. Until the action for termination of his parental rights case was brought against him in May, 1996 those were the only two payments of child support. In the three years that the parties were separated, Steven had paid $100 toward the support of his children during 1993. In 1994, he paid nothing. In 1995, he paid nothing. In 1996 he paid nothing until the termination action was commenced on May 14, 1996. The adjudicatory date, that is, the date to which the court may consider evidence on the grounds for termination, is the date of filing. Practice Book § 1042.1(4). While Steven made a few payments of child support subsequent to the commencement of this action, they have no bearing on the adjudicatory grounds.
Approximately two months after the decree of dissolution of marriage, in February, 1994, Steven was convicted of a violation of probation and was incarcerated until January, 1995. During this period of time, while in jail, Steven requested visitation. Lisa wrote him a letter in which she said that she believes she had made a mistake bringing Alyssa to the prison during Steven's first incarceration, and she had no intention of bringing the two children to visit him. She did not believe that prison would be a good place to begin a relationship with Stephanie. She recognized that while in prison Steve had time to reflect and might then wish to "reach out for things or people that aren't with you . . but I'm not about to let these kids be used to heal a soft spot CT Page 13870 or an aching spot that you may have at this time." Lisa told him that once he got out and began his regular support payments and "play the whole (father) role" he could see the children. (Respondent's Exhibit A).
Steven did get out in January, 1995. He testified he called Lisa when he first got out. Lisa told him to straighten out his life, get a job and told him: "Steve, I'm not going to do it, take me back to court." Steven told his best friend Tony Sullo, that he intended to get a good job, save some money, hire a lawyer, go back to court on the visitation issue.
Steven did get a good job. He continues to hold a good job where he is considered one of the best employees and he supervises forty other employees. His payroll records indicated that he made $21,416 in 1996 and $19,259 through nine months of 1997 (average $2,140 per month). Yet he has not paid his weekly support obligation for the children. He has not gone back to court to obtain visitation rights. He did not send cards, letters or gifts to his children for more than two years. "Actions speak louder than words", according to an old proverb. In the words of the street, "He talked the talk, but he didn't walk the walk." He accrued child support arrearages in excess of $10,000, he did not contact the children, he made no vigorous efforts to get his legal affairs in order. He was content to have occasional thoughts of goodwill toward the children. That does not satisfy one's parental obligations.
His friend Tony Sullo, testified in court. He was asked about Steven's scheme to save some money, hire a lawyer and then get some visitation. Tony said the goal was unattainable. "[B]asically, he has a gambling problem. He loses money, I've seen him play black jack, craps whatever, down at the casino. He loses a substantial amount of his pay check."
Steven testified in court. He had been examined by Dr. Robert Meier. Steven is a twin, his parents divorced when they were five years old. He completed the tenth grade in school and subsequently obtained a GED. He has no insight into why his former wife is petitioning for termination of his parental rights and shows absolutely no appreciation for the children's present situation. He expresses no regret or remorse over his failure to provide any responsibility for the children's welfare over the years. His principal interest appears to be getting visitation rights for his mother. CT Page 13871
Steven's psychological profile indicates that he is quite defensive and guarded in responding to questions. His scores suggest that he is rebellious toward authority figures and is often likely to be in conflict with authorities. "Such individuals often do not have strong relationships with families and family members and they tend to blame others for their difficulties."
Dr. Meier indicates that there is no on-going relationship between Steven and the children.
 The children have had little contact with their biological father for several years. This was prevented largely by his own actions, and inactions, as well as choices by mother to set reasonable conditions for any contact. Stephanie and Alyssa now view Mr. S. (Lisa's husband) as their psychological father, feel secure with the family that he and mother have provided them, and would best be served by seeing that family unit as permanent and stable. Most guidelines regarding permanency planning suggest that when there is failure on the part of parent to provide for the needs of a child, conservatively, within two years, alternate plans to secure permanency should be sought . . . . Therefore, it is the opinion of this evaluator that it is not in the children's best interest to allow more time to establish a parent/child relationship." (Petitioner's Exhibit #14)
 III. Adjudication
The petitioner claims that the children have been abandoned by the male biological parent in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. G.S. 17a-112 (c) (3)(A); [Probate] G.S. § 45a-717(g)(2)(A). Abandonment focuses on the parent's conduct. In re Michael M.,29 Conn. App. 112, 614 A.2d 832 (1992); In reRayna M., 13 Conn. App. 23, 36, 534 A.2d 897
(1987); In re Kezia M., 33 Conn. App. 12, 632 A.2d 1122
(1993). [The abandonment statute] "does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." In re Kezia M., Id at 18. "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In re Michael M., CT Page 13872 supra; In re Rayna M., supra 37-38; In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).
This court finds by clear and convincing evidence that Steven did not maintain a reasonable degree of concern for his children. He allowed the full obligation for care, nurturing, support and guidance to fall upon the children's mother and the children's step-father. He acted in accordance with his own wishes. He was able to maintain a job, carry on a relationship with another woman, and regularly attend to his gambling activities. These children were not a priority for him. He simply did not demonstrate the degree of parental devotion and responsibility that society expects of a parent. He failed to meet his parental responsibilities in any meaningful manner.
"[Steven's] imprisonment hardly complicates the issue. The incarceration of a parent does not alone constitute abandonment.In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443,446 A.2d 808 (1982); In re Juvenile Appeal (84-6) 2 Conn. App. 705,711, 483 A.2d 1101 (1984) cert. denied, 195 Conn. 801,487 A.2d 564 (1985). The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In re Juvenile Appeal (Docket No. 10155), supra In ReShannon S., 41 Conn. Sup. 145, 153, 562 A.2d 79 (1989).
Some of the obligations of parenthood can be pursued, even from prison. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; . . . . and (5) the duty to furnish social and religious guidance." In reJuvenile Appeal (Docket 9489), 183 Conn. 11, 15, 438 A.2d 801
(1981) quoting In re Adoption of Webb, 14 Wash. App. 651, 657,544 P.2d 130 (1975). This court finds that the father took no action to maintain a relationship with his children; he did not visit them; he did not communicate with them; he did not provide guidance; he did not express concern. His efforts which did occur were tepid, late and ineffectual as far as his relationship with his children is concerned. The children have no relationship with him, nor he with them. He has, by his conduct, effectively abandoned the children within the contemplation of General Statutes § 45a-717. CT Page 13873
IV. Mandatory Findings.
The court makes the following factual findings required by § 45a-717(h):
1) Appropriate and timely services were neither requested nor provided by the Department of Children and Families except for the preparation of a social study. The social worker who prepared the report testified that it was the first report of its kind that he had ever prepared. He recommended against termination of parental rights and in favor of restoring visitation. The report was shallow and incomplete. It did not address the grounds for termination of parental rights. It did not address the complete failure of the father to meet his parental and court ordered obligations to the children. It did not discuss or analyze the reasons for the lack of a relationship with the children. The report concluded that Steven ". . . now holds a job and has met all court ordered obligations." The social worker did not in any way attempt to address the children's need for permanency and stability.
2) The only known court order or expectation was the child support obligation which Steven simply disregarded. It was as if it did not exist. This court finds that Steven failed to meet the only court ordered obligation he had, namely, to support his children financially.
3) The children have strong emotional ties with the mother and step-father who have provided the physical, emotional and educational support the children need. The children have little or no positive emotional ties to the male biological parent. The step-father who treats these children as his natural children, is viewed as the psychological father.
4) Finding regarding the age of the children. The children are eight and four years of age. The children require stability of placement and continuity of care. This child, Alyssa, is of sufficient age and capacity to express an intelligent preference as to placement. The child's attorney and Alyssa support a resolution that leads to adoption by the step-father.
5) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The father has not made realistic and sustained efforts to conform his conduct to even CT Page 13874 minimally acceptable parental standards. He has made some effort to rehabilitate himself, although his propensity to gamble may have dissipated his assets to the point that he is unable to support his children. In re Christina V., 38 Conn. App. 214
(1995) He has not manifested the robust interest in seeing his children that indicates a strong parental concern. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the children to be reunited. In re Luis C.210 Conn. 157 (1989); In re Juvenile Appeal 183 Conn. 11, 15.(1981) A) Steven has not maintained contact with the children. B) He has made only token effort to contact the children's guardian, his former wife.
6) Finding regarding the prevention of a parent from having a meaningful relationship etc. While the male biological parent was incarcerated for about two years of the children's lives, this factor alone did not prevent regular, continuing contact with the children. As far as is known, had Steven obeyed the court order to support his children and stayed out of conflict with the criminal justice system, he could have continued the Sunday visitation that Lisa had allowed him immediately following the dissolution of the marriage. Only his conduct prevented his failure to maintain a relationship with these children. It is unlikely that Steven accepts this possibility. No unreasonable conduct is noted.
Further the court is mindful of the overwhelming policy of requiring parents to financially support their children. In reBruce R., 234 Conn. 194 (1995). There has been no showing in this case that the father has adequately supported these children. In fact, the evidence supports a finding that the children's male biological parent is over $10,000 in arrears on his support obligation. The termination of his parental rights will only free these children for adoption by a person who has historically supported them.
V. ORDER
The court finds that this ground has existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the children's best interest to terminate the parental rights of Steven at this time. This finding is made after considering the children's sense of time, their need for a secure and CT Page 13875 permanent environment, the relationship that the children have with their step-father, and the totality of circumstances that the termination of parental rights is in the children's best interest. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyondthe Best Interests of the Child 99 (1979).
It is accordingly, ORDERED that the parental rights of Steven A. are hereby terminated. The children's mother shall be their sole parent and legal guardian of the person of Alyssa and Stephanie. General Statute § 45a-717(j).
By the court,
Francis J. Foley, Presiding Judge Child Protection Session