## IN RE JUVENILE APPEAL (84-6)*
## (2560)

HULL, BORDEN and SPALLONE, Js.

Argued October 4—decision released November 20, 1984

*Paul D'Astous,* for the appellant (father of the minor children).

*John H. Doermann,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellee (commissioner of children and youth services).

*Cornelius J. Ivers,* for the minor children.

SPALLONE, J. This is an appeal by the respondent, the father of three minor children, from a judgment terminating his parental rights to his children pursuant to General Statutes § 17-43a.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

The record reveals the following facts: On January 2, 1982, the respondent killed his wife, the mother of the children involved in this appeal, and their fifteen year old daughter in the family apartment. The three surviving children, who were present in the home at the time, were placed by the department of children and youth services (hereinafter DCYS) with foster caretakers. Under an ex parte order of temporary custody, the children were subsequently placed in the care of relatives.

The respondent, who had fled to Puerto Rico, was apprehended and charged with two counts of murder. He pleaded guilty to both counts under the Alford doctrine; *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); and was sentenced to concurrent terms of imprisonment totalling forty years.[1] Thereafter, the children were adjudicated as "uncared for"[2] and committed to the custody of DCYS.

DCYS petitioned under General Statutes § 17-43a to terminate the respondent's parental rights with respect to each of the children. The trial court granted the petitions on the ground that there was "no ongoing parent-child relationship" and that "to allow further time for the establishment or reestablishment of such parent-

---

[1] The respondent is currently serving that sentence at the Connecticut Correctional Institution, Somers.

[2] General Statutes § 46b-120 provides in pertinent part: "[A] child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires."

General Statutes § 46b-129 (a) provides in pertinent part: "[T]he commissioner of children and youth services . . . having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court . . . a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120 . . . and praying for appropriate action by the court . . . ."

child relationship would be detrimental to the best interest of the child."[3] The respondent has appealed from that judgment.

The sole issue in this appeal is whether the court erred in finding that there was no ongoing parent-child relationship between the respondent and his children. The respondent claims that there was insufficient evidence to support the conclusion that no ongoing parent-child relationship existed. We disagree.

Our statutes define the termination of parental rights as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . ." General Statutes § 45-61b (g). It is a most serious and sensitive realm of judicial action. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). When state interference is brought to bear on the parent-child relationship, the natural rights of parents in their children are to be afforded deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois,*

[3] This determination was based on General Statutes § 17-43a which provides: "(a) In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129 . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child . . . . The superior court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that over an extended period of time, which, except as hereinafter provided in this subsection, shall not be less than one year: . . . (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."

The court dismissed as not proven an alternate ground alleged by DCYS pursuant to General Statutes § 17-43a (a) (2), which provides for termination of parental rights if the parents have failed to achieve a degree of personal rehabilitation that would allow them to assume a responsible position in their child's life. The dismissal of this alternate ground is not at issue in this case.

405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 13, 438 A.2d 801 (1981); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979); *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 466, 473 A.2d 795 (1984). To justify the termination of parental rights in the absence of consent, one or more of the grounds set forth in General Statutes § 17-43a must be proven by clear and convincing evidence. *In re Juvenile Appeal (84-3),* supra, 467; see *In re Juvenile Appeal (83-CD),* 189 Conn. 276, 296, 455 A.2d 1313 (1983).

General Statutes § 17-43a (a) (4), the section pursuant to which the trial court terminated the respondent's parental rights, requires that a two-pronged determination be made. First, the court must determine that no ongoing parent-child relationship exists; and second, it must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. *In re Juvenile Appeal (Anonymous),* supra, 670; *In re Juvenile Appeal (84-3),* supra, 479.

Here, the respondent claims that the trial court erred in its finding as to the first prong of the determination. Specifically, he argues that the court erred in concluding that there was no ongoing parent-child relationship because the children have present memories and feelings for him. The respondent claims that these memories or feelings, although negative, are proof of his ongoing parental relationship with his children. He bases his argument on *In re Juvenile Appeal (Anonymous),* supra, in which the Supreme Court, in construing § 17-43a (a) (4), stated: "It is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite

its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent. . . . The statute does not authorize the termination of parental rights upon a showing of a troubled relationship, but only upon a showing of *no* relationship." (Emphasis in original.) Id., 670–71.

We must keep in mind that in fashioning the definition of "no ongoing parent-child relationship" the Supreme Court in *In re Juvenile Appeal (Anonymous),* supra, was construing General Statutes § 17-43a (a) (4). Both the statute and its subsequent judicial gloss must be read so as to make common sense and so as not to lead to a bizarre result. *Eagle Hill Corporation* v. *Commission on Hospitals & Health Care,* 2 Conn. App. 68, 75, 477 A.2d 660 (1984). Thus, in applying that definition to the facts of this case, we focus on "the ultimate question [of] whether the child has no present memories or feelings *for* the natural parent." (Emphasis added.) *In re Juvenile Appeal (Anonymous),* supra. Common sense and the avoidance of bizarre results dictate that we read that language in its ordinary meaning. As the respondent conceded in argument before this court, his line of reasoning would apply as well if the children had similar feelings toward him resulting from an attempt, on his part, to kill *them.* As used here, "for" means "what is said or felt in favor of someone or something: pro." Webster, Third New International Dictionary. We must conclude, therefore, that the phrase "feelings for the natural parent" refers to feelings of a positive nature. It does not encompass the extreme, psychologically corrosive and destructive feelings which are evident in this situation.

This tragic case forces us, therefore, to consider the meaning of "no ongoing parent-child relationship" in a family scenario which exceeds in pathos the trouble and confusion which characterized the parent-child rela-

tionship in *In re Juvenile Appeal (Anonymous),* supra. The oldest of the children, A, had the devastating experience of seeing his father repeatedly stab his mother and sister after a violent argument.[4] A testified that he does not want to see or talk to his father because of what he did and that he has not spoken with him since the killings. The court found that all three children have a valid reason to fear the respondent, and that they do not want to see, talk to or hear from him. The court also accepted the testimony of Rolando Martinez, a psychiatric social worker at the Child Guidance Clinic for Central Connecticut, who had seen the children approximately eight to ten times and testified that, when discussing the respondent, the children are depressed, anxious and fearful of the respondent, and that the thought of having contact with him elicited in them suicidal and homicidal thoughts. He stated that any continued contact with the respondent would be further damaging to the children and that some long-term emotional and psychological problems would follow them throughout their lives. Martinez concluded that the children were not prepared to deal with the respondent at any time in the near future and that, although they may wish to have contact with their

---

[4] The son testified, in part, as follows:

"Q. What happened?

"A. They got into an argument at I don't know what time it was. He came in the room, started arguing and fighting, and then he asked her did she want him to stay there. She said no, because he was drunk. She said if he comes drunk, he has to leave. So then he came drunk. She told him leave, and he started hitting her, punching her, and then he came in the room with a knife and he hit my mother and sister and they scratched his face. Then he took out the knife and started stabbing them.

"Q. Do you know how many times he stabbed her?

"A. No.

"Q. Was it many times?

"A. Yeah, he took turns like."

father at some time in their adult lives, there was no need for them to have any forced contact with him during their childhood.[5]

We recognize that incarceration of a parent alone does not constitute abandonment; *In re Juvenile Appeal (Docket No. 10155),* 187 Conn. 431, 443, 446 A.2d 808 (1982); or cause for termination of that parent's rights. *Matter of Troy,* 27 Or. App. 185, 188–89, 555 P.2d 933 (1976); see *In re Juvenile Appeal (Docket No. 10155),* supra. Here, however, there is more. The respondent is incarcerated because he has, by his own actions, not only terrorized his children but denied them a maternal relationship.

In *In re Juvenile Appeal (Anonymous),* supra, 674–75, the mother-child relationship in question possessed certain positive attributes. While the evidence revealed "a relationship in a state of some disrepair"; id; the child claimed still to love and enjoy her visits with her mother. In this case, the childrens' ideations of homicide and suicide, sleep disturbances, nightmares and other after-effects of the respondent's acts sharply contrast to the affection expressed in *In re Juvenile Appeal (Anonymous),* supra.[6] Somewhere a line must be drawn

---

[5] The record also reveals a history of domestic violence by the respondent towards his wife and children. A study submitted to the trial court by Helen Figueroa, a DCYS social worker, states that the wife "allegedly suffered facial bruises and a head injury, requiring eighteen stitches" resulting from an argument with the respondent. In a report to the DCYS, Rolando Martinez and Herbert Gewirtz, Clinical Director of the Child Guidance Clinic for Central Connecticut, quote the children as stating: "[The respondent] use [sic] to beat us kids and my mother everyday. One time he hit my mother in the head with a chair. In New York I had to call the cops on him twice. I don't have any good memories about him."

[6] In that case, the mother was separated from her child because she was involuntarily committed to a state hospital. During the three month period of the mother's hospitalization, the child was adjudicated "uncared-for" and committed to the care of DCYS. The mother's subsequent attempts to reunite with her child were stymied by financial difficulties and administrative delays. Despite her efforts, DCYS successfully petitioned to revoke her parental rights.

between a relationship which is "troubled and confused"; id., 670;[7] and one in which a parent by his own act has caused the destruction of a family. In striking at the heart of the family, the respondent demonstrated total disregard for the impact of his actions upon the emotional well-being of his children. The legacy of this disregard will live with the children for many years to come.

There is no error.

In this opinion the other judges concurred.

---

[7] The court's characterization of the parent-child relationship as "troubled" in *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 670, 420 A.2d 875 (1979), appears to have arisen as much from the development of an "intervening formation of a new relationship between the child and her foster parents"; id.; as from any problems which preceded the mother's involuntary commitment, as to which that case is silent.