2001 OK 103

**In the Matter of the ADOPTION OF C.D.M., a minor child, Kori Rene Wyman and David Lee Wyman, Petitioners/Appellees,**

v.

**Chad Louis MAXWELL, Respondent/Appellant.**

**No. 94,879.**

Supreme Court of Oklahoma.

Dec. 4, 2001.

Laura Haag McConnell, Oklahoma City, OK, for Petitioners/Appellees.

Christopher A. Wood, Oklahoma City, OK, for Respondent/Appellant.

KAUGER, J.:

¶ 1 Two issues are presented: 1) whether a father who was denied visitation and who was incarcerated for stalking and assaulting the mother and violating a victim's protective order (VPO) which was entered to protect the child and its mother from the father's acts of violence may rely on court orders to excuse his lack of relationship with the child; and 2) whether sufficient evidence was presented to support a finding that the adoption is in the child's best interests. We hold that: 1) the father may not rely on the existence of court orders to excuse his lack of relationship with the child; and 2) the trial court's determination that the adoption was in the best interests of the child is supported by the evidence.

### FACTS

¶ 2 On February 11, 2000, the appellees, Kori Rene Wyman and her husband, David Lee Wyman (collectively Wymans/respectively mother and stepfather), filed a petition for the stepfather to adopt the mother's child

(C.D.M./child) without the consent of the appellant, Chad Louis Maxwell (Maxwell/father).[1] In their petition, the Wymans asserted that the father's consent was unnecessary because he had for twelve months of the fourteen months immediately preceding the filing of the petition: 1) wilfully failed to maintain a significant relationship with the child; and 2) wilfully failed, refused, or neglected to contribute to the support of the child in substantial compliance with a court order.

## A. Agreed Facts.

¶ 3 The parties jointly stipulated to several facts. On January 8, 1996, the mother gave birth to C.D.M. Maxwell is the biological father of the child. Since July of 1996, Maxwell has had no relationship with C.D.M. On August 2, 1996, a permanent protective order was entered against Maxwell in favor of the mother and the child. The order prohibited any contact or communication between Maxwell and either the mother or the child, with the provision that the order could be modified by an assigned Judge in any domestic proceeding between the parties.[2] Maxwell made no effort to contact the child. Maxwell wrote to the mother, but she took no steps to punish him for his violation of the protective order.

¶ 4 In March of 1997, Maxwell was arrested and charged with criminal trespass on the property of the mother, for felony stalking and repeatedly telephoning the mother, breaking into the mother's apartment and for hiding in her closet, and violating the permanent protective order. He pled guilty to the stalking charges and was sentenced to a five year suspended sentence except for the first three years. On June 4, 1997, Maxwell filed a petition to establish paternity and a request for visitation with the child. On October 29, 1997, a temporary order was entered which denied visitation and ordered child support in the amount of $141.80 per month.

¶ 5 On March 12, 1998, Maxwell plead guilty to additional charges of assault and battery and another violation of the VPO stemming from an incident in which he assaulted and battered the mother in a convenience store parking lot and attempted to take the child forcibly from the mother's car. He was sentenced to one year. He began serving his sentences for his convictions in November of 1998. A decree establishing Maxwell as the father, but denying visitation was filed on December 2, 1999, and child support was set at $125.00 per month. Although he receives between $8.00 and $11.00 a month in wages at the prison, Maxwell has never forwarded any portion of his earning to the mother for child support. However, Maxwell's mother sent a money order dated September 21, 1999, for $160.00, checks for $125.00 on December 13, 1999, and December 29, 1999, respectively which was apparently from the sale of Maxwell's personal property.

## B. Facts Reflected in the Record.

¶ 6 In addition to the stipulated facts, the record reflects that the mother was fourteen when she met Maxwell, a twenty-five-year-old, father of four children. They began dating, and the mother gave birth to C.D.M when she was seventeen. Maxwell stayed with the mother at her parents' house for about ten days after the child's birth. Although he visited periodically, the parents never married and the mother and Maxwell never lived together after the child's birth.

---

1. The child was represented at trial by a guardian *ad litem* who was also an attorney. The guardian *ad litem* did not appear in this appeal to represent the child.

2. The protective order provides in pertinent part:

"... The Defendant is Ordered **NOT TO ABUSE, INJURE, ASSAULT, MOLEST, HARASS, THREATEN OR OTHERWISE INTERFERE** with the victims.
The Defendant is Ordered **NOT TO VISIT OR COMMUNICATE** with the Victim.
The Defendant is Ordered **TO LEAVE AND STAY AWAY FROM THE RESIDENCE** located at where the Plaintiffs reside.
The Defendant is Ordered to **CEASE HARASSING** the Victims.
The Defendant is Ordered to **CEASE STALKING** the Victims.
. . .
This Order specifically applies to the minor ... and is subject to any appropriate modification, *in writing*, which may be made by the assigned judge in any domestic action between the parties." (*Emphasis in original.*).

When C.D.M. was six months old, the mother met and began dating the stepfather. They were married on May 7, 1998, and had a child together on December 14, 1998.

¶ 7 According to the mother, rather than spending time developing a relationship with the child, Maxwell used any opportunity he could to pressure her to resume a relationship with him. After an incident in which Maxwell became intoxicated and threatened to keep the child in an effort to keep her from ending their relationship, she obtained the protective order because he was climbing on her roof, peeking in her windows and making harassing phone calls. He admitted that when he broke into the mother's apartment, he was not expecting to see or communicate with the child. Maxwell did not seek modification of the protective order to attempt to allow communication or any alternative contact with the child. In August of 1997, Maxwell followed the mother into a parking lot, opened her car door, pulled her from the car, threatened her and shoved her into a wall. He then got into the back seat of her car and attempted to remove the child from the car seat before leaving. Although Maxwell denies the mother's version of the events, he pled guilty to the charges stemming from the incident. The judgment and sentence regarding this incident specifically prohibited contact with the mother.

¶ 8 On October 30, 1997, Maxwell wrote a letter to the mother informing her that the child was covered by his medical insurance and requesting a photograph of the child. On December 15, 1997, he sent another letter inquiring about the child. The mother refused Maxwell's sister's request to take the child to visit Maxwell in jail, but she initially allowed his mother limited visitation with the child. Later, however, Maxwell's mother was asked not to contact the mother or the child.

¶ 9 At the hearing on the adoption without the consent of the father, the trial judge, based on the stipulated facts and exhibits, ruled in favor of the Wymans on the issue of whether Maxwell had maintained a significant relationship with the child. As a result of the trial court's ruling, the Wymans subsequently withdrew and abandoned their argument regarding Maxwell's alleged failure to support the child. The trial court then heard evidence relating to whether the adoption was in the child's best interests.

¶ 10 On May 26, 2000, the trial court entered an order, determining that: 1) the child was eligible for adoption without the consent of the father; and 2) it was in the best interests of the child to permit the stepfather to adopt the child. The father appealed. The Court of Civil Appeals reversed and remanded, finding that the mother and stepfather failed to establish the element of wilful failure to maintain a significant relationship with the child. We granted certiorari on April 30, 2001.

## I.

¶ 11 A FATHER WHO WAS DENIED VISITATION AND WHO WAS INCARCERATED FOR STALKING AND ASSAULTING THE MOTHER AND VIOLATING A PROTECTIVE ORDER WHICH WAS ENTERED TO PROTECT THE CHILD AND ITS MOTHER FROM THE FATHER'S ACTS OF VIOLENCE MAY NOT RELY ON THE EXISTENCE OF COURT ORDERS TO EXCUSE HIS LACK OF RELATIONSHIP WITH THE CHILD.

¶ 12 The Wymans assert that the adoption should proceed without the consent of the natural father because: 1) it is undisputed that Maxwell has had no relationship with the child since the child was six months old; 2) Maxwell wilfully and intentionally through illegal and threatening actions sought to control and intimidate the mother, rather than seek modification of the protective order in an attempt to establish a relationship with the child; 3) Maxwell's conduct was wilful and intentional and he took actions which he knew would have the result of preventing a relationship with his child; and 4) to allow Maxwell to rely on his own illegal and threatening acts toward the mother and the child as a grounds to prevent adoption would violate public policy. Maxwell admits to the violations of the protective order, but characterizes his behavior as a misguided effort to see the child. He argues that his lack of relationship should be excused, not

only by the fact that he was involuntarily incarcerated but also by the fact that court orders prohibited him from having any contact with the child.

¶ 13 The law presumes that consent of a child's natural parents is necessary before an adoption may be effected.[3] The exceptions to this presumption are found in *10 O.S. Supp.1998 § 7505–4.2.*[4] Section 7505–4.2 provides the avenue by which adoptions may be obtained without prior consent of the parents which effectively terminates that parent's rights. One of the situations in which a nonconsensual adoption may be obtained under § 7505–4.2(H)[5] is if a parent wilfully fails to maintain a significant relationship with the child through visitation or communication for a period of twelve months out of fourteen months immediately preceding the filing of the petition for adoption. The burden is on the party seeking to adopt without consent to prove such adoption is warranted by clear and convincing evidence.[6] Accordingly, the decision of the trial court will not be disturbed unless it fails to rest on clear and convincing evidence.[7]

¶ 14 At the outset, we note that the relevant statutory period is from December 11, 1998, to February 11, 2000. During the relevant period the father has been incarcerated, denied visitation by a paternity order, and prohibited from contacting the mother and/or the child by a protective order. Because Maxwell relies on his incarceration and the court orders to excuse his lack of relationship with the child and prevent the adoption without his consent, we must decide whether, under *10 O.S. Supp.1998 § 7505–4.2* (H),[8] the father's lack of communication and lack of relationship with the child was wilful within the intent of the statute, obviating the necessity of obtaining his consent to the adoption.

¶ 15 We have not previously applied § 7505–4.2(H) in this context circumstances in which a natural father, through his own fault, has placed himself in a position where he is not permitted by court orders to visit or communicate with his child and maintain a satisfactory relationship. However, in the *Matter of Adoption of V.A.J.*, 1983 OK 23, 660 P.2d 139, this Court addressed whether the life imprisonment of a natural father for murder was sufficient *per se* to establish the child's eligibility for adoption without parental consent on the grounds of wilful failure to contribute to the support of the minor child. The section of the statute at issue in *V.A.J.* related to the failure of a parent to contribute to the child's support as a means for adoption without consent. It required wilful failure, refusal, or neglect to contribute to the support of a child for a period of twelve months prior to the filing of the petition for

---

**3.** *Matter of Adoption of R.R.R.*, 1988 OK 109, ¶ 6, 763 P.2d 94; *Matter of Adoption of C.M.G.*, 1982 OK 156, ¶ 9, 656 P.2d 262.

**4.** Title *10 O.S. Supp.1998 § 7505–4.2.*

**5.** Title *10 O.S. Supp.1998 § 7505–4.2* (H) provides:

"Consent to adoption is not required from a parent who willfully fails to maintain a significant relationship with a minor through visitation or communication for a period of twelve (12) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for adoption of the child."

The statute was renumbered from *10 O.S. Supp. 1993 § 60.6*, and amended by Laws 1997, c. 366, § 27, eff. November 1, 1997.

See also, *10 O.S. Supp.1998 § 7505–4.1* (A), which provides in pertinent part:

"If consent to adoption or permanent relinquishment for adoption has not been obtained from both parents of a minor who is the subject of a petition for adoption, and the rights of

the nonconsenting parent or parents have not previously been terminated, the petitioner for adoption, a consenting parent, or a legal guardian or legal custodian of the minor may file an application to terminate the parental rights of the putative father. The grounds for terminating a putative father pursuant to this section shall be identical to the grounds for permitting an adoption without the consent of a parent pursuant to Section 7505–4.2 of this title."

**6.** *White v. Adoption of Baby Boy W.*, 2000 OK 44, ¶ 35, 10 P.3d 212; *Matter of Adoption of R.W.S.*, 1997 OK 148, ¶ 10, 951 P.2d 83; *Matter of Adoption of J.R.M.*, 1995 OK 79, ¶ 12, 899 P.2d 1155.

**7.** *White v. Adoption of Baby Boy W.*, see note 6, supra; *Matter of Adoption of A.W.H.*, 1998 OK 61, ¶ 3, 967 P.2d 1178; *Matter of Adoption of R.W.S.*, see note 6, supra.

**8.** Title *10 O.S. Supp.1998 § 7505–4.2* (H), see note 5, supra.

adoption.[9]

¶ 16 In *V.A.J.*, the father's only source of income was a meager monthly stipend from his parents which would be granted or withdrawn at will. The Court held that incarceration alone is not enough to support termination of parental rights. This holding was consistent with the majority view from other jurisdictions.[10] Regarding whether failure to support was wilful and his parental rights could be terminated, the *V.A.J.* court said:

"The statutory language of § 60.6(3) is clearly devoid of any explicit legislative intent that imprisonment for any crime or for any duration afford a ground for dispensing with a parents consent. The statute requires wilful failure or refusal to contribute. Imprisonment cannot be equated with wilful failure to contribute to the child's support. The natural father's conduct was not to be deemed wilful when, as here, incarceration prevents his making any contribution to the child's support. The proper inquiry to address in this case is whether the natural parent intentionally incapacitated himself for the purpose of avoiding the duty imposed by law; if so, then imprisonment may constitute justification for dispensing with his consent in the adoption proceeding. The evidence here does not support an inference that the father's commission of a felony, and subsequent incarceration therefore, was for the purpose of avoiding his support obligation. Thus his incapacity to earn income and pay support may not be deemed 'wilful.' "

¶ 17 *V.A.J.* involved the failure of a parent to contribute to the child's support as a means for adoption without consent. While incarceration of a parent during the relevant statutory period, standing alone, may not furnish a ground for automatic termination of parental rights, neither does incarceration insulate an inmate from the termination of parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent. Nevertheless, although parental rights may not be terminated solely for a parent's incarceration, parental incarceration and the reason for the incarceration—i.e. the nature of the crime committed as well as the person against whom the criminal act was perpetrated are relevant to the issue of whether parental consent to an adoption is necessary. The question of intent is to be determined in each case from all of the facts and circumstances.

¶ 18 Decisions of other states are of limited value because they are based largely on different factual circumstances or on the particular language of statutes.[11] However, it is

9. Title *10 O.S.1981 § 60.6* provides in pertinent part:

"A legitimate child cannot be adopted without the consent of its parents, if living, nor a child born out of wedlock without the consent of it mother, if living, except that consent is not necessary from a father or mother: ...
(3) Who, for a period of twelve (12) months next preceding the filing of a petition for adoption of a child, has willfully failed, refused or neglected to contribute to the support of such child. ..."

10. See generally, G. Sarno, Annot. "Parent's Involuntary Confinement, or Failure to Care for Child as Result Thereof, as Permitting Adoption Without Parental Consent," 78 A.L.R.3d 712 (1977).

11. Although the circumstances here involve a natural father, who through his own fault, has placed himself in a position where he is not permitted by court orders to visit or communicate with his child and maintain a satisfactory relationship, we note that a few courts have concluded that an incarcerated parent's failure to communicate may not be considered wilful where the actions of other parties and not the conduct of the parent prevented the parent from communicating with the child. See, e.g., *South Carolina Dept. of Social Serv. v. Wilson*, 344 S.C. 332, 543 S.E.2d 580, 583 (S.C.App.2001) [Parental rights should not have been terminated on alleged ground that parent failed to visit or support his children for six months because Department of Social Services actively prevented visitation.]; *Peyla v. Martin*, 40 Ill.App.3d 373, 352 N.E.2d 407, 410–11 (1976) [Parole officer's instruction to parolee-parent not to seek visitation with children and refusal to grant parolee-parent's request for travel permits precluded finding of parent's wilful failure to maintain interest in child.]. *In re Taylor*, 30 Ill.App.3d 906, 334 N.E.2d 194, 196 (1975) [Where mother's efforts to contact her children had been frustrated by the Department of Children and Family Services, lack of contact between mother and children would not support Department's claim that the parent was unfit solely because she did not contact her children.]; But see, *State in Interest of M.C.*, 940 P.2d 1229, 1234–35 (1997) [Mother's

noteworthy that several other courts when faced with non-consensual termination of parental rights have concluded that: 1) the parent's incarceration and the conduct which resulted in incarceration as well as the person against whom the criminal act is committed are factors which may be considered in determining whether parental rights should be terminated; 2) a parent's wilful criminal act and course of conduct can imply a conscious disregard and indifference to the child in respect to parental obligations that a parent owes to a child; and 3) intent is generally an inferred fact determined by conduct within the statutory period combined with relevant conduct both before and after such period.[12]

¶ 19 Parental obligations entail minimal attributes such as: 1) expression of love and affection for the child; 2) expression of personal concern over the health, education and general well-being of the child; 3) the duty to supply necessary food, clothing, and medical care; 4) the duty to provide adequate domicile; and 5) the duty to furnish

incarceration did not represent wilful conduct justifying termination of her parental rights when she was precluded by court order from maintaining contact with children, or any adults having custody of her children during period of incarceration.].

12. See, e.g., *Crawford v. Arkansas Dept. of Human Serv.* 330 Ark. 152, 951 S.W.2d 310, 312 (1997) [Nature of the crime itself is relevant factor in addition to conduct during incarceration.]; *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250, 260–61 (1992) [Termination sought based on intentional abandonment of child for six months or more immediately prior to the filing of the petition. Question of abandonment was largely one of intent to be determined from all of the facts and circumstances. The court affirmed the non-consensual termination of a parent's parental rights who embarked on despicable conduct, an intentional act which evidenced disregard for the parent-child relationship and welfare of the child, not to mention the victim. The parent's conscious decisions supply circumstances for the conclusion that he had abandoned the child.]; *Matter of J.J.J.*, 718 P.2d 948, 952 (Alaska 1986) [For a non-custodial parent to block a stepparent adoption he or she must have maintained meaningful contact unless prevented by doing so by circumstances beyond the non-custodial parent's control. Circumstances resulting from the non-custodial parent's own conduct cannot excuse such a parent's significant failure to provide support or maintain meaningful communication.]; *Matter of Interest of Pawling*, 101 Wash.2d 392, 679 P.2d 916, 919–20 (1984) [To determine whether a parent has abandoned a child under circumstances showing a wilful substantial lack of regard for parental obligations, parent's incarceration, conduct resulting in incarceration, and person against whom criminal act committed are factors to be considered.]; *In Interest of F.H.*, 283 N.W.2d 202, 213 (N.D.1979) [Incarceration alone is not a defense to abandonment, nor is does is *per se* constitute abandonment. However, abandonment may rest upon confinement coupled with other factors, such as parental neglect, withholding affection, no contact, no support, financial or otherwise and disregard for the general welfare of the child.]; *Zgleszewski v. Zgleszewski*, 260 Ark. 629, 542 S.W.2d 765, 768 (1976) [Wilful criminal acts and the course of conduct followed thereafter indicate a conscious disregard to children and an indifference to their welfare tantamount to voluntary abandonment.]; *Hamby v. Hamby*, 264 S.C. 614, 216 S.E.2d 536, 538 (1975) [Voluntary acts which resulted in repeated imprisonment, failure to support and negligible contact with child support the inference that parent was guilty of such conscious disregard of indifference to parental obligations as to evince a settled purpose to forego obligations and duties to child.]; *In re Staat*, 287 Minn. 501, 178 N.W.2d 709, 712 (1970) [Fact of imprisonment may combine with other factors such as parental neglect and a withholding of parental affection.] *In re A.B.M.*, 17 S.W.3d 912, 915 (Mo.App. S.D. 2000) [Abandonment focuses on the parties' intent taking into consideration all evidence of the parent's conduct before and after the applicable statutory period.]; *H.W.S. v. C.T.*, 827 S.W.2d 237, 241 (Mo.App. E.D.1992) [Intent regarding abandonment or neglect is an inferred fact, determined by conduct which may have occurred before, after, or during the six-month statutory period. Nature of crime is a relevant factor especially if it is disintegration of the family unit.]; *In re Juvenile Appeal*, 2 Conn.App. 705, 483 A.2d 1101, 1104 (1984) [Incarceration of a parent alone does not constitute abandonment or cause for termination of parental rights. However, it is different when a parent is incarcerated because he has, by his own actions, not only terrorized his children, but denied them a maternal relationship]; *Matter of Adoption of Doe*, 99 N.M. 278, 657 P.2d 134, 137 (N.M.App.1982) [In determining whether father who murdered child's mother had neglected and abandoned child, incarceration coupled with other factors such as neglect, lack of affection, failure to maintain a relationship, and failure to provide financial support for a child may be considered.]; *South Carolina Dept. of Social Serv. v. Parker*, 336 S.C. 248, 519 S.E.2d 351, 355 (S.C.App.1999) [A parent's conduct which evinces a settled purpose to forego parental duties may fairly be characterized as wilful because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent.].

social and religious guidance.[13]  Maxwell was incarcerated for stalking and assaulting the mother and violating a protective order which was entered to protect the child and its mother from his acts of violence.  Here, the father clearly never assumed his responsibilities as a parent nor did he attempt to foster a healthy, loving, and supportive relationship with his child.  Rather, since the child's birth, he has embarked on intentional acts which evidence a total disregard for the parent-child relationship and the welfare of the child.  His conduct which resulted in incarceration was in direct contradiction to basic parental obligations.  Maxwell's conscious decisions supply the circumstances for the conclusion that he did not intend to establish or maintain a significant relationship with the child.  Consequently, we hold that the father may not rely on the existence of the court orders to excuse his lack of relationship with the child.

¶ 20 Considering all aspects of the father's intentional conduct, the evidence clearly and convincingly establishes that the father wilfully failed to maintain a significant relationship with the child through visitation or communication for a period of twelve consecutive months out of the last fourteen months immediately preceding the filing of the petition for adoption.  This situation is obviously within the intention of *10 O.S. Supp.1998 § 7505–4.2* (H).[14]  The state, through its Legislature, has wide power with respect to the rights of parents over their children which affect the welfare of the child.[15]  In order to protect the integrity of the home and natural bond between parent and child,[16] a strict construction of adoption statutes is required.[17]  However, the Legislature has provided that parental rights must yield when the welfare of the child so demands.[18]  The record establishes that the trial court's determination is supported by the requisite clear and convincing evidence.

## II.

¶ 21 **THE TRIAL COURT'S DETERMINATION THAT THE ADOPTION WAS IN THE BEST INTERESTS OF THE CHILD IS SUPPORTED BY THE EVIDENCE.**

¶ 22 In addition to the statutory requirements, this Court has also required that the adoption and termination of parental rights be in the best interests of the child.[19]  Maxwell argues that there was insufficient evidence to support the trial court's determination that the adoption was in the best interests of the child.[20]  The Wyman's insist

**13.** *Matter of Interest of Pawling,* see note 12, supra.

**14.** Title *10 O.S. Supp.1998 § 7505–4.2* (H), see note 5, supra. The Legislature could have, but did not address the effect of court orders and whether they may be considered when determining whether a parent wilfully neglected to maintain significant relationship with the child.  See e.g., S.C.Code Ann. § 20–7–1572 (Supp.2000) which provides that it "must be shown that the parent was not prevented from visiting by the party having custody or by court order" when determining a parent's wilful failure to visit.

**15.** *Carignan v. State,* 1970 OK 82, ¶ 10, 469 P.2d 656.

**16.** *Matter of Adoption of R.R.R.,* see note 3, supra; *Matter of Adoption of C.M.G.,* see note 3, supra; *Mann v. Garrette,* 1976 OK 170, ¶ 9, 556 P.2d 1003.

**17.** *Matter of Adoption of R.R.R.,* see note 3, supra; *Matter of Adoption of C.M.G.,* see note 3, supra; *Adoption of Robin,* 1977 OK 219, ¶ 25, 571 P.2d 850.

**18.** *Carignan v. State,* see note 15, supra; See, *Mahan v. Moore,* 1946 OK 352, ¶ 8, 198 Okla. 67, 175 P.2d 345 [Title 10 manifests the Legislature's care for the welfare of children subject to adoption.]. The welfare of the child will not be ignored. *In re Adoption of Graves,* 1971 OK 15, ¶ 16, 481 P.2d 136; *Conville v. Bakke,* 1964 OK 111, ¶ 22, 400 P.2d 179 [The adoption statute is strictly construed in favor of rights of natural parents when the controversy is between the natural parents and persons seeking to destroy their parental status, but the welfare of the child is not to be ignored in considering the validity of the adoption proceedings.].

**19.** *Matter of Adoption of Baby Boy W.,* 1992 OK 58, ¶ 13, 831 P.2d 643.

**20.** We note that the Court of Civil Appeals held that the issue of whether the father wilfully failed to maintain a significant relationship with the child was dispositive.  Consequently, it did not reach the issue of whether the trial court's determination that the adoption was in the child's best interest was supported by the evidence.  When this Court vacates the opinion of the Court of Civil Appeals, we may address any issue properly

that the trial court's determination that the adoption was in the child's best interests was supported by the evidence.

■ ¶ 23 The primary issue in adoption is whether the adoption will promote the best interests of the child.[21] It is the duty of the trial court in adoption matters to determine whether the adoption would be in the child's best interests.[22] In an adoption proceeding, the decision of the trial court need not rest on uncontradicted evidence.[23] The trial court is in the best position to evaluate credibility of witnesses,[24] and is therefore entitled to deference on issues of fact.[25]

■ ¶ 24 The record reflects that the stepfather has been an active part in the child's life since the child was an infant. The stepfather and child have a strong bond and a close relationship. The child has been a member of the Wyman family since 1998, and he calls his stepfather "Daddy" and considers him to be his father. The Wymans had a daughter and the child considers her his sister and he refers to himself with the last name "Wyman." The child does not know Maxwell at all or recognize Maxwell's family members as relatives. It appears that the love and consideration and the responsibility of a parent for a child has been given by the mother and stepfather and that the stepfa-

ther provides all of the child's financial support.

¶ 25 Even though the *guardian ad litem* recognized that the mother was not free from fault in alienating the child from his father, he nevertheless expressed concern that the father's reaction to the mother's efforts to alienate the child was extreme, to the extent of having a Victim Protective Order entered against him which he knowingly, wilfully, wantonly violated not once, but twice resulting in four criminal charges being filed. Although he also expressed concern that the stepfather had a child with whom he voluntarily chose not to pursue a relationship, the *guardian* ultimately recommended that it was in the child's best interests to allow the adoption to proceed.

¶ 26 In contrast, the father presented evidence that he was a good father to his other four children because he spent some time with them and that he loved this child too. Although Maxwell insists that before his relationship with the mother ended, he at least provided some emotional support for the mother before and shortly after the child's birth and cared for the child occasionally, it appears that rather than demonstrating a full commitment to the responsibilities of parenthood by participating in the rearing of the child,[26] he instead chose to spend any oppor-

raised in the appeal or remand the cause to the Court of Civil Appeals for that court to address such an issue. Rule 1.80, 12 O.S. Supp.1997, Ch. 15, App. 1, Oklahoma Supreme Court Rules. *Hough v. Leonard*, 1993 OK 112, ¶ 18, 867 P.2d 438.

21. *State ex rel. Department of Inst., Social and Rehabilitative Serv. v. Griffis*, 1975 OK 164, ¶ 20, 545 P.2d 763, 83 A.L.R.3d 363; *In re Adoption of Greer*, 1969 OK 163, ¶ 13, 463 P.2d 677; *Wade v. Mantooth*, 1966 OK 121, ¶ 0, 417 P.2d 313.

22. *Matter of Adoption of G.D.L.*, 1987 OK 115, ¶ 17, 747 P.2d 282; *State ex rel. Department of Inst., Social and Rehabilitative Serv. v. Griffis*, see note 21, supra.

23. *Matter of Adoption of A.W.H.*, 1998 OK 61, ¶ 4, 967 P.2d 1178; *Mueggenborg v. Walling*, 1992 OK 121, ¶ 9, 836 P.2d 112.

24. *White v. Adoption of Baby Boy D.*, 2000 OK 44, ¶ 36, 10 P.3d 212.

25. *Matter of Adoption of A.W.H.*, see note 7, supra; *Mueggenborg v. Walling*, see note 23, surpa.

26. See, *In re Termination of Parental Rights of Biological Parents of Baby Boy W.*, 1999 OK 74, ¶ 10, 988 P.2d 1270 [Only when an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child does his interest with his child acquire substantial protection under the due process clause.]; *Matter of Adoption of Baby Boy D.*, 1985 OK 93, ¶ 45, 742 P.2d 1059, *cert. denied., Harjo v. Duello*, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988) [Due process protects only the parent child relationships of biological parents who have actually committed themselves to their children and have exercised responsibility for rearing their children.]; *Matter of Adoption of Baby Girl M*, 1997 OK CIV.APP. 33, ¶ 46, 942 P.2d 235 [The Legislature has enacted a series of statues designed to protect both biological fathers who demonstrate sufficient indicia of responsibility toward their progeny balanced against protection of the best interests of children whose parents do not demonstrate such responsibility.]. See also, *White v. Adoption of Baby Boy D.*, note 24, supra [Father failed to grasp his opportunities to parent child and father failed to assume his parental responsibilities with regard to the child.].

tunity he could to pressure the mother into resuming a relationship with him. The only attempts made by Maxwell to pursue any kind of contact or relationship with the child were illegal actions which ultimately necessitated a Victim Protective Order and which lead to his conviction for felony stalking and assault and battery on the mother. The trial court's finding that the best interests of the child would be served by approving the adoption and maintaining the child's current family unit are supported by the evidence. Consequently, we hold that the trial court did not err in finding that the adoption was in the best interests of the child.

## CONCLUSION

¶ 27 Nonconsensual adoption may be obtained under *10 O.S. Supp.1998 § 7505–4.2* (H) [27] if a parent wilfully fails to maintain a significant relationship with the child through visitation or communication for a period of twelve months out of fourteen month immediately preceding the filing of the petition for adoption. The burden is on the party seeking to adopt without consent to prove such adoption is warranted by clear and convincing evidence.[28] The decision of the trial court will not be disturbed unless it fails to rest on clear and convincing evidence.[29]

¶ 28 When a parent is incarcerated during the relevant statutory period, the question of intent is to be determined in each case from all of the facts and circumstances including the nature of the crime committed as well as the person against whom the criminal act was perpetrated. A father who was denied visitation and who was incarcerated for stalking and assaulting the mother and violating a protective order which was entered to protect the child and its mother from the father's acts of violence may not rely on the existence of court orders to excuse his lack of relationship with the child. The trial court's determination that the best interests of the child would be served by approving the adoption and maintaining the child's current family unit is supported by the evidence.

¶ 29 WATT, V.C.J., HODGES, KAUGER, SUMMERS, WINCHESTER, JJ. concur.

¶ 30 HARGRAVE, V.C.J., LAVENDER, OPALA, BOUDREAU, JJ. dissent.

OPALA, J., with whom HARGRAVE, C.J. and LAVENDER, J., join, dissenting.

¶ 1 The court holds today that neither a father's incarceration nor his previous court-ordered bar of visitation will provide a defense against a mother's complaint of his *willful* failure to maintain a relationship with his child, a ruling which, pursuant to the terms of *10 O.S. Supp.1998 § 7505–4.2* (H),[1] may result in the nonconsensual termination of paternal status. **Today's pronouncement is fraught with state and federal constitutional infirmities.** Insofar as the court's ruling deprives the father of his interposed defense of *lack of willfulness*, it *denies* him unimpeded *access to court*[2] and *due process*[3]

27. Title *10 O.S. Supp.1998 § 7505–4.2* (H), see note 5, supra.

28. *White v. Adoption of Baby Boy W.*, see note 6, supra; *Matter of Adoption of R.W.S.*, see note 6, supra; *Matter of Adoption of J.R.M.*, see note 6, supra.

29. *White v. Adoption of Baby Boy W.*, see note 6, supra; *Matter of Adoption of A.W.H.*, see note 7, supra; *Matter of Adoption of R.W.S.*, see note 7, supra.

1. The pertinent terms of *10 O.S. Supp.1998 § 7505–4.2* (H) provide:

"Consent to adoption is not required from a parent who *willfully* fails to maintain a significant relationship with a minor through visitation or communication for a period of twelve (12) consecutive months out of the last four-teen (14) months immediately preceding the filing of a petition for adoption of the child." (Emphasis supplied).

2. The terms of Art. 2 § 6, Okl. Const., state:

"The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

A ruling barring one from the access to court which is essential to the relief sought is violative of Art. 2, § 6, Okl. Const., *Carter v. Carter*, 1989 OK 153, ¶ 2, 783 P.2d 969, 970.

3. The text of Art. 2 § 7, Okl. Const., provides:

"No person shall be deprived of life, liberty, or property without due process of law."

The pertinent provision of U.S. Const. amend. XIV § 1 states:

affordable under the state and federal fundamental charters. There is *no indication in the pertinent statute of legislative intent to sanction either complete destruction or even an abridgment of this father's defense based on his lack of willfulness*[4]. Today's pronouncement that rules out that defense is arbitrary and impermissible.[5] *When a court circumscribes the range of plainly admissible probative facts to show the absence of willfulness, due process is offended.*[6] The tone of today's opinion—pronouncing that the father "may not rely on the existence of court orders to excuse his lack of relationship with the child"[7]—denies him full opportunity to explore all available facts that are probative of his lack of willfulness. Today's ruling operates significantly to restrict his access to the courts for establishing a statute-based defense against the mother's termination quest.

"[N]or shall any state deprive any person of life, liberty, or property, without due process of law; ..."

Depriving a child-support or alimony obligor from participation in judicial proceedings for failure to pay support constitutes a denial of due process. *Carter, supra* note 2, at ¶2, at 970 (citing *Bishop v. Bishop*, 1958 OK 16, ¶18, 321 P.2d 416, 417 and *Hovey v. Elliott*, 167 U.S. 409, 444, 17 S.Ct. 841, 854, 42 L.Ed. 215 (1897)). Early jurisprudence recognized that due process signifies, at minimum, one's right to participate in judicial proceedings and to be given a meaningful opportunity to be heard. *Hovey, supra, 167 U.S. at 417*, 17 S.Ct at 844.

4. The statutory ground upon which the termination proceeding is rested plainly calls for proof of willful neglect. For the text of *10 O.S. Supp. 1998 § 7505–4.2* (H) see *supra* note 1.

5. The range of critical defense evidence cannot be restricted without offending traditional and fundamental standards of due process. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.E.2d 297 (1973); Davis v. Alaska, *415 U.S. 308*, 319–20, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974).

6. The U.S. Constitution guarantees all defendants a meaningful opportunity to be heard in order to present a complete defense. Crane v. Kentucky, *476 U.S. 683*, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citing California v. Trombetta, *467 U.S. 479*, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). Rules that exclude defense evidence are unconstitutionally arbitrary or disproportionate where they infringe upon a weighty interest of the defendant. United States

¶2 The common law knows not of judicial severance of a parental tie.[8] Parental relationship is viewed as eternal, indestructible and hence incapable of dissolution.[9] Because the common law does not allow the parent-child bond to be severed, courts cannot alter this status-based relationship without a faithful obedience of the statutory terms[10] Today we are creating a **termination neither sanctioned by legislation nor cognizable at common law.**

¶3 Proceedings to terminate one's recognized family status present matters of grave consequence. Constitutional law surrounds both the marital as well as the parental status with a panoply of protections. Consistently with the obligations imposed by the due process clause, indigent individuals seeking dissolution of a marital bond are entitled to court access at the expense of the govern-

v. Scheffer, *523 U.S. 303*, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413 (1998) (citing Rock v. Arkansas, *483 U.S. 44*, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987)). Due process is violated by the exercise of judicial power in an action which was not reasonably calculated to inform interested parties of its pendency. It logically follows that due process is also violated by the exercise of judicial power in an action where a party is not given a reasonable opportunity to be heard. Johnson v. Scott, *1985 OK 50*, ¶11, *702 P.2d 56*, 59. Minimum standards of due process require that persons be afforded not only notice but also an opportunity to be heard before any of their substantial rights may be altered or affected. Patel v. OMH Medical Center, Inc., *1999 OK 33*, ¶39, *987 P.2d 1185*, 1200 n. 56 (citing Matter of Estate of Pope, *1990 OK 125*, ¶3, *808 P.2d 640*, 642–43)).

7. Referencing the opinion of the court.

8. *Davis v. Davis*, 1985 OK 85, ¶20, 708 P.2d 1102, 1111 (abrogated by subsequent legislation and then overruled on other grounds).

9. *Id.*

10. The text of *25 O.S.1991 § 29* states:

"The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to the laws of this state, which are to be liberally construed with a view to effect their objects and to promote justice."

Liberal construction of a statute is not a device for extending the ambit of an enactment beyond its intended scope. *Davis*, at ¶20, at 1111.

ment,[11] and parental-status termination decrees are constitutionally infirm unless they be based on clear and convincing proof.[12] A state does not act in a manner consistent with the due process and equal protection clauses,[13] when it conditions, based on the litigant's ability to pay, a parent's access to appellate review of a decree that destroys parental rights.[14]

¶ 4 Parental terminations are, perhaps, the most serious of all status-based bond severance proceedings. Federal due process and equal protection afford safeguards protecting familial associations. Oklahoma also surrounds all access to courts with constitutional shelter.[15] Yet, today's pronouncement severely abridges this father's recognized federal- and state-law shields by fashioning a short-cut to termination that is neither legislatively sanctioned nor cognizable at common law. *I hence recede from today's pronouncement because it (a) severely abridges this litigant's statute-based opportunity to defend against the mother's severance quest by demonstrating that one indispensable probative element is absent* from the evidence she adduced in the proceeding—that of **willful failure** "to maintain a significant relationship with a minor through visitation or communication ..." and (2) *invites* as well as *licenses* the use of public law's quasi-criminal process regime (victim protection orders) as a designing custodial parent's collateral weapon for orchestrating the destruction of the noncustodial sire's legal status.

---

11. *Boddie v. Connecticut*, 401 U.S. 371, 374, 91 S.Ct. 780, 784, 28 L.Ed.2d 113 (1971).

12. *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599 (1982).

13. The pertinent provision of U.S. Const. amend. XIV § 1 states:

"[N]or shall any state ... deny to any person within its jurisdiction the equal protection of the laws."

14. *M.L.B. v. S.L.J.*, 519 U.S. 102, 102, 117 S.Ct. 555, 556, 136 L.Ed.2d 473 (1996).

15. For the text of Art. 2 § 6 see *supra* note 2.