2003 OK CIV APP 7

**In the Matter of the ADOPTION OF D.L.A., a minor,**

**Steven Earl French, and Merri Annette French, Petitioners/Appellees,**

v.

**Michael Patrick McKenrick, Respondent/Appellant.**

**No. 97,869.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Oct. 25, 2002.

John C. Harris, III, Tulsa, OK, for Respondent/Appellant.

N. Scott Johnson, Sneed Lang, P.C., Tulsa, OK, for Petitioners/Appellees.

Opinion By CAROL M. HANSEN, Presiding Judge:

¶1 Appellant, Michael Patrick McKenrick, D.L.A.'s biological father, appeals from the trial courts' order finding D.L.A. may be adopted without his consent. We find the order on appeal is not founded on clear and convincing evidence and reverse.

¶2 On June 6, 2001, Appellees, Steven Earl French and Merri Annette French (Mother), D.L.A.'s biological mother, filed an

application in the trial court for an order determining D.L.A. eligible for adoption without the consent of Appellant McKenrick (Father). The application alleged Father's consent was not needed for the adoption because he had [a] willfully failed to maintain a significant relationship with D.L.A. and [b] willfully failed, refused or neglected to contribute to D.L.A.'s support, both for a period of twelve consecutive months out of the fourteen months preceding filing of the application.

¶ 3 The legal authority cited by Appellees for adoption without consent, and the authority for the trial court's determination that Father's consent was not necessary, is 10 O.S.2001 § 7505–4.2.[1] In pertinent part, § 7505–4.2 provides:

B. Consent to adoption is not required from a parent who, for a period of twelve (12) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for adoption of a child ..., has willfully failed, refused, or neglected to contribute to the support of such minor: ...

2. According to such parent's financial ability to contribute to such minor's support if no provision for support is provided in an order.

The incarceration of a parent in and of itself shall not prevent the adoption of a minor without consent.

¶ 4 Although not stated precisely, the essence of Father's first appellate proposition is that the trial court erred in finding his failure to support D.L.A. *willful* under § 7505–4.2. The issue of willfulness is a question of fact. *In the Matter of Adoption of Darren Todd H.*, 1980 OK 119, 615 P.2d 287. The burden was on Appellees to bring forth clear and convincing evidence to prove a parent's consent may be obviated in accordance with § 7505–4.2. *Id.*, at 288.[2] The decision of the trial court will not be dis-

turbed unless it fails to rest on clear and convincing evidence. *In re Adoption of C.D.M.*, 2001 OK 103, 39 P.3d 802. Section 7505–4.2, which effectively terminates parental rights, is to be strictly construed. *Id.*, at 810.

¶ 5 The § 7505–4.2 fourteen month period here was April 2000 to June 2001, the latter being the date of Appellees' application. Father concedes he did not provide any support to D.L.A. during that period, but argues that omission was not willful. In support of this argument, Father states he was incarcerated on a drug charge in January 1999, and was released on parole in September 2000. Thus, Father was incarcerated for approximately five of the statutory fourteen month period.

¶ 6 Section 7505–4.2(B) expressly provides that incarceration "*in and of itself* shall not prevent the adoption of a minor without consent." (Emphasis added). Implicit in this language is that incarceration is nevertheless a proper consideration in determining if the section should be applied. Willfulness is a necessary element of that determination. In addressing the question of willful failure to support a child where the father was imprisoned for life, the Oklahoma Supreme Court has reasoned:

Imprisonment cannot be equated with wilful failure to contribute to the child's support. The natural father· is not to be deemed wilful when, as here, incarceration prevents his making any contribution to the child's support.... The evidence here does not support an inference that the father's commission of a felony, and subsequent incarceration therefor, was for the purpose of avoiding his support obligation.[3] Thus his incapacity to earn income and pay support may not be deemed "wilful."

*Matter of Adoption of V.A.J.*, 1983 OK 23, 660 P.2d 139.

---

1. The applicants erroneously cited *"Okla. Stat. tit. 10, § 60.6"*, but that section was recodified as § 7505–4.2 in November 1997. Laws 1997, c. 366, § 58, eff. Nov. 1, 1997.

2. *But see, In the Matter of Adoption of A.W.H.*, 1998 OK 61, 967 P.2d 1178 (appears to, without differentiation, direct use of both the "clear and

convincing" and "clear weight of the evidence" standards.)

3. There is no evidence Father's incarceration resulted from an intent to avoid the support duty imposed by law. *In re Adoption of C.D.M.*, 39 P.3d at 808.

¶ 7 In *V.A.J.*, the specific issue before the Court was whether life imprisonment alone was sufficient *per se* to establish willful failure to support the child. The *V.A.J.* Court answered that question in the negative, but did consider the father's income while imprisoned. The Court refused to consider a $25.00 monthly stipend from the father's parents "as a resource in gauging the father's ability to contribute", and noting the record revealed no other source of income held, "[i]n the eyes of the law he should stand before the court as a resourceless prisoner."

■ ¶ 8 Here, Father had a prison income of $7.25 per month, out of which he had to buy his own personal use items. Father's testimony that he had no other income or assets is uncontroverted. While there is some evidence his family voluntarily attempted to help Father with child support, the family's efforts may not be properly considered in determining the question of Father's willfulness under § 7505–4.2. *Matter of Adoption of V.A.J.*, P.2d at 141; *In re Adoption of R.A.D.*, 1999 OK CIV APP 119, 992 P.2d 929.

¶ 9 The *V.A.J.* Court, excluding the $25.00 monthly family stipend to the incarcerated father, found the father had *no* resources with which to support the child. The *V.A.J.* Court's majority did not consider the issue presented here, *i.e.*, whether a *de minimis* income would constitute Father a "resourceless person" for the purpose of determining ability to provide support. Vice Chief Justice Simms, however, in his specially concurring opinion, did consider that issue, and while we recognize it is not precedential, we find his reasoning instructive.

¶ 10 Vice Chief Justice Simms would have considered the $25.00 family stipend within the "totality of resources" available to the father, but went on to note "it is the negligible amount of the income, not its source which takes the failure [to support] outside the statute." Vice Chief Justice Simms further reasoned:

> The income is simply not sufficient to afford any meaningful contribution toward the child's support. Justus' "financial ability" under the statute is virtually non-existent.

> ... all parents are also entitled to invoke defenses against the reach of the statute which requires a "wilful" failure to contribute as ordered or according to financial ability ...., it is a defense to be unable to comply in a meaningful way. (Citation omitted).

> ... there is considerable room for debate about the dollar figure which, under any particular facts, would show an inability to contribute or comply, as opposed to simply a diminished ability which would still require some contribution. Nevertheless, there clearly is a point at which reasonable men would agree that a parent's income is so limited that any meaningful contribution cannot be made. Additionally, that to require a payment of a portion of that limited resource, such as a dime a month, simply to stave off this type of action ... celebrates form over substance.

> If a father who was not in prison was able to garner monthly resources of only $25, would he be subject to the sanction of losing his children under [§ 7505–4.2]. I do not believe so, for in such a case we would undoubtedly find the failure is not wilful.

¶ 11 Appellees have produced no evidence that Father had any income while incarcerated other than his $7.25 prison pay. We find this is, as Vice Chief Justice Simms posited, a point at which reasonable men would agree Father had no financial ability to make a meaningful contribution to D.L.A.'s support. Vice Chief Justice Simms remarked, in response to a comment by the *V.A.J.* trial court, that the contribution of "one thin dime" would have been an "empty gesture" which would "mock the purpose of support statutes." Similarly, demanding that Father make some meaningless contribution to D.L.A. out of his *de minimis* income just to avoid the application of § 7505–4.2(B) would not further the purpose of that statute. Applying the requisite standard of strict construction, we cannot find the Legislature would have intended such a result.

■ ¶ 12 As we set forth above, § 7505–4.2(B) demands that the willful failure to provide support be "for a period of twelve (12) consecutive months out of the last four-

teen (14) months immediately preceding the filing" of the adoption petition. Under the facts present here, there is not clear and convincing evidence that Father had *any* financial ability to contribute to D.L.A.'s support during five of those fourteen months. In fact, it seems apparent from the trial court's concluding remarks from the bench that its decision was based on the "nine months between the release and the filing of the Petition for Adoption." That period does not satisfy the twelve consecutive month requirement.

¶ 13 Even if not for the above determination, we would not have been persuaded there was clear and convincing evidence Father's failure to support D.L.A. was willful. In a perfect world, Father possibly could have made more significant efforts to somehow get some support to D.L.A. The record here however reveals far from perfect circumstances.

¶ 14 Remarking on relations between Mother and Father, the trial court commented, "the war has raged ... since 1997." That animosity extended to both their families. Father obtained a protective order in 1997 against Mother and her parents. He testified he believed that order prohibited him from contacting Mother also. Mother testified she was scared of Father, and "did not ever want [Father] to ever know where I lived." She further testified that her mother and sister would not have told Father where she lived. The court-appointed special advocate in D.L.A.'s deprived child case testified Mother did not want Father, "or anyone in the paternal family" to know where she lived.

¶ 15 While he was in prison, Mother had moved from the house she had shared with Father. Her telephone number was not listed. Mother testified she had given D.L.A.'s paternal grandmother her telephone number because the grandmother had visitation with D.L.A. during the deprived child case, but the last contact was in November 1999 while Father was incarcerated. Father and his sister testified their mother had not told them she had Mother's telephone number until they were preparing for Father to file a motion to set visitation and child support in

April 2001. The present action was filed shortly after Father had filed his motion.

¶ 16 Father testified he had tried, through the Department of Corrections and the Department of Human Services (DHS), to get some part of his $7.25 prison pay sent for D.L.A.'s support but had no success. While this was before the statutory fourteen month period in controversy, it has relevance in that it would have discouraged further such efforts in that period. Father asked his mother and sister to send support for D.L.A. through DHS, but he stated the money was rejected by DHS. Additionally, Father did file his motion to set visitation and child support during the fourteen month period. That motion demonstrates Father's willingness to provide support.

¶ 17 Father's sister testified she had assisted him in trying to find Mother and D.L.A. from the time of his release from incarceration. DHS would not provide the information. She checked telephone directories and internet sources with no success. She knew where Mother's sister lived because she had picked up D.L.A. there for visitation during Father's incarceration, but testified she did try to locate Mother through her family because she was "99.9 percent sure" they would not have helped. She eventually located Mother in April 2001 through court records on the Oklahoma State Courts Network on the internet. Father filed his visitation and child support *motion* shortly after that.

¶ 18 There is some evidence that Father could have sent support, at times when he may have had the financial ability to do so, by letters through Mother's relatives. The trial court recognized this as speculative and we agree, particularly in view of the apparent animosity between the families. In view of these, at best, strained relations, Father's attempt to resolve the matter of support through court action was not unreasonable. He initiated that action in a timely manner after discovery of Mother's whereabouts.

¶ 19 The Oklahoma Supreme Court in *V.A.J.,* at 141, restated the well established principle that:

Parents have a fundamental, constitutionally-protected interest in the continuity of

the legal bond between themselves and their children. The integrity of familial status is a value to be regarded with great solicitude.

¶ 20 Because of the gravity of the decision, we hold those who "seek to destroy the parental status" to a high standard of proof—clear and convincing evidence. *V.A.J.*, at 141. We find Appellees have not met that burden. The trial court's order is REVERSED.

ADAMS, J., dissents with separate opinion; MITCHELL, J., concurs.

ADAMS, J., dissenting.

¶ 1 Because the majority sentences the child in this case to being forever legally tied to a parent who would not give up any of his *de minimis* income to demonstrate *any* commitment to assuming responsibility for his child, I dissent. The conclusion reached by the majority is contrary to Presiding Judge Hansen's decision in *Matter of the Adoption of C.D.M.*, 2001 OK 103, 39 P.3d 802 and is based on an inaccurate view of the purpose of Oklahoma's adoption statutes.

¶ 2 In *C.D.M.*, in which I concurred, we reversed a trial court order determining the child eligible for adoption without the father's consent because the trial court had improperly considered gifts of approximately $60.00 monthly in determining whether the father had wilfully refused to support the child in accordance with his ability to do so. In doing so, we followed the rule adopted by the Oklahoma Supreme Court in *Matter of the Adoption of V.A.J.*, 1983 OK 23, 660 P.2d 139.

¶ 3 However, C.D.M.'s incarcerated father had monthly prison income of only $7.25 per month, without the considering the gifts. Rather than holding such a *de minimis* income could not form the basis for a finding of wilful failure to support, we remanded the case to the trial court to consider whether the statutory criteria had been satisfied, in effect, holding that on those facts it was a question for the exercise of the trial court's discretion. Now, based on evidence of the same level of income, the majority rejects that conclusion and determines *as a matter*

*of law* that the trial court has no such discretion.

¶ 4 To support that conclusion, the majority relies primarily on then Vice Chief Justice Simms' specially concurring opinion in *V.A.J.*, 1983 OK 23, ¶ 1–12, 660 P.2d at 144–145. That opinion is based upon the assumption that the primary purpose of Oklahoma's statutory approach to allowing children to be adopted without a parent's consent, where the parent has wilfully failed to support the child in accordance with their ability to do so, is to ensure that children receive an appropriate level of support. I disagree.

¶ 5 In my opinion, the statutory language, "according to such parent's financial ability," contained in 10 O.S.2001 § 7505–4.2(B)(2) evinces a Legislative intent to require parents to demonstrate a willingness to accept the responsibility of being a parent by contributing to the support of the child consistent with their ability to do so *no matter how small that contribution may be.* This policy is not adopted for punishment of the parent, as the majority's focus on the *de minimis* impact a small contribution would have had on D.L.A. seems to suggest, but it is about allowing children born to a parent who is unwilling to deprive himself or herself of even "one thin dime" for his or her child to have a parental relationship with a person who is *voluntarily* assuming the responsibility to nurture, love, and support that child. On this record, I do not believe Oklahoma law deprives D.L.A. of that potential.

¶ 6 The record contains abundant evidence that during the requisite statutory period, Father had the wherewithal to contribute at some level to D.L.A. He does not deny that. While incarcerated, Father's basic physical needs were provided by the State of Oklahoma, and after his release, he testified he was saving money. The trial court observed the witnesses and was in the best position to judge whether Father's claim that he tried to pay support but could not because he did not know D.L.A.'s location, which was unsubstantiated by any other evidence, was credible.

¶ 7 I would affirm the trial court's order and remand the case for an appropriate hearing concerning whether this adoption is in

D.L.A.'s best interest, including the impact of Father's belated attempts to assume responsibility for D.L.A. I respectfully dissent.