HELLER v. BALLINGER
2023 OK CIV APP 4
525 P.3d 444
Case Number: 119814
Decided: 05/17/2022
Mandate Issued: 02/16/2023
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2023 OK CIV APP 4, 525 P.3d 444

 

IN THE MATTER OF THE ADOPTION OF A.M.H., A Minor Child,

AUSTIN HELLER, Appellant,
v.
SUSANNA MARIE BALLINGER and DAVID ADAM BALLINGER, Appellees.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, OKLAHOMA

HONORABLE K. NIKKI KIRKPATRICK, TRIAL JUDGE

REVERSED

Christopher D. Smith, Glenn K. Brown, Sara D. Willey, Tommy J. Pfeil, BALL MORSE LOWE, Oklahoma City, Oklahoma, for Appellant

Richard E. Smalley, IV, Tristan L. Davis, REDHAWK LAW, Norman, Oklahoma, for Appellees

Hallie E. Bovos, Assistant Public Defender, Oklahoma County, Oklahoma City, Oklahoma, for the Minor Child

JANE P. WISEMAN, PRESIDING JUDGE:

¶1 Austin Richard Heller (Father) appeals a trial court order finding that his minor child AMH is eligible for adoption without his consent. Because Petitioners' evidence to support their petition that Father failed to maintain a substantial and positive relationship with the child was not clear and convincing, we reverse the trial court's decision.

FACTS AND PROCEDURAL BACKGROUND

¶2 On January 29, 2021, David Adam Ballinger (Ballinger) and Susanna Marie Ballinger (Mother)(collectively, Petitioners) filed a petition for stepparent adoption in which Ballinger sought to adopt AMH. It appears that Ballinger and Mother had been married about two weeks when they filed the petition. Ballinger alleges that Mother had previously been vested with custody of AMH, with Father having standard visitation. Petitioners allege AMH is two years-old, but they listed her birth year as 2010, which was obviously a typographical error. They claim that Father "has willfully failed to maintain a meaningful, significant, and positive relationship with [AMH] for twelve (12) of the fourteen (14) months immediately preceding the filing of this Petition." They asked that Father's parental rights be terminated and that Ballinger be allowed to adopt AMH without Father's consent.

¶3 Petitioners also filed an application for adoption of AMH without Father's consent asserting that his consent "is not required in this matter because the father has failed to maintain a meaningful and significant relationship with the child for a period of twelve (12) of the last fourteen (14) months."

¶4 A hearing was held on July 1, 2021. The twelve-month period relevant to the petition to adopt without consent as alleged by Petitioners is January 2020 to January 2021. At trial, Mother testified that in January 2020, AMH was sixteen months-old. According to Mother, FaceTime between Father and AMH "averaged about once a month" and Father "would grow frustrated that [AMH] couldn't communicate with him or wasn't showing interest in the phone call." Mother said there were between eight and twelve FaceTime communications during the relevant period, but there were also phone calls directly between the parents to discuss AMH's hospitalizations.

¶5 She said Father had one visit with AMH during the relevant period, which was a visit over the weekend. When asked if Father had any overnight visits, she said they agreed that AMH "would feel most comfortable at home overnights." Mother said Father was scheduled to have a five-day visit with AMH in December 2020. There was much testimony from the witnesses about this December visit. Mother suggested that the visit was all set up, but Father disputed this in his testimony. Mother claims that Father was missing for the five days scheduled for the visit.

¶6 Mother explained that AMH was in the hospital five times during the relevant period due to respiratory issues. Mother agreed that "it's not a regular thing," but that "[i]t just kind of happens sometimes" when AMH "has an attack." AMH was hospitalized so that she could receive albuterol. Mother said Father did not visit, even though AMH could have two visitors and there were no problems with COVID associated with the visitors to the hospital for AMH.

¶7 Mother testified that Father moved to Oklahoma after she and Ballinger filed the case and has had in person visits with AMH. Mother acknowledged that sometimes Father requested FaceTime calls that were not answered because she considered the timing inappropriate. She also acknowledged connection problems as Father is an underwater welder working 30 days offshore, followed by 30 days onshore. Mother acknowledged that there could have been connection problems. Father works on a ship in the Gulf of Mexico. She said that there is a WiFi connection that can be paid for, but she did not directly answer the question of whether she knew if the ship had limited bandwidth for communication. She acknowledged that there were times Father notified her by text that he had been trying to call her.

¶8 Mother also acknowledged that Father purchased all of the gifts on AMH's birthday gift registry and that Father expressed concern in April about his exposure to COVID and visiting AMH. She testified to the following about a text from Father regarding COVID:

So my first line that I responded to was to ease that, I said, I know, but just think you're going to get to see [AMH] so soon. And he said, Am I though? There have been confirmed cases on the ship and people have been getting medevaced and quarantined in their rooms. I'm doing the best I can to stay healthy but it feels like only a matter of time. As much as I want to come and see you-all when I get off, I'm in a small area that has been exposed to the virus and it's not like I'm going to be able to find a COVID-19 test clinic at any hospital, so I'm F'd. I have no idea when I'll be able to come down and spend real time with this virus going on and it's F'ing me up.

Mother said Father is current on his child support and has provided for AMH.

¶9 Father testified that for his August visit with AMH, he was able to do a two-week quarantine before visiting AMH in Oklahoma and then another two-week quarantine before he returned to the ship. He still had a high level of concern for his August visit, but in contrast to April, in August he had the proper time to quarantine. He testified that the primary reason he did not visit in October and November was his concern about COVID. He planned a visit for December and obtained a COVID test before he flew from Boston, Massachusetts. Father moved in with his mother in Massachusetts after he was scammed out of approximately $4,000 when he put down a deposit and paid for the first and last months' rent for an apartment in Louisiana that was not actually for lease.

¶10 Father attended dive school in South Carolina from March through September 2019. His work schedule is either from noon to midnight or midnight to noon every day while he is on board ship. He works on the ship generally for 30 days and sometimes extended to 45 days. He says he does not get cell service where he works, approximately 160 to 180 miles into the Gulf of Mexico, but the ship does have satellite WiFi. He said, "And when you're trying to connect to that, with the other 150 to 200 people aboard that ship, you might be lucky to send three texts in a day, you might be lucky to send in your time sheet to the company that you work for." Some of his messages or calls might not go through. He has only been able to FaceTime once while offshore.

¶11 Father testified he has never missed a child support payment. He has sent AMH "[b]irthday presents, holiday presents, Christmas presents; everything." He said that quarantine was required for residents of Louisiana and he could not find COVID tests to take before visiting AMH, and he did not want to put AMH at risk by visiting because of her respiratory problems.

¶12 Father admitted that he made a mistake regarding the December visit. From the testimony at trial, it appears that Father had been communicating online with a woman and he thought she had died. He said that he was supposed to go for a reading of her will and was flying to New Orleans for that purpose. He said he tentatively planned to visit Oklahoma during this time period. But when he arrived in Chicago from Boston, he "received the call from the apparent dead-not-dead girlfriend." He was not sure about what would happen, so he made tentative plans to go to Oklahoma. But he did not go to Oklahoma, and he admitted that was a mistake. He did not know if the girlfriend would show up. He booked a ticket to Oklahoma for the day after he arrived in Chicago. Father called to ask Mother if he could come to visit. He said, "This was not a predetermined visit. This was a spur of the moment, out of the blue, I'm in Chicago right now and I don't know what I'm doing."

¶13 In her testimony, Mother said she tried to contact Father for five days when he did not arrive in Oklahoma and tried to contact the police and hospitals because she was concerned about him. Father texted her after those five days to tell her that he had arrived back in Massachusetts. Mother characterized Father's actions as "pure negligence" and "[t]he opposite" of a substantial and positive relationship. Mother indicated that she did not tell AMH about Father's planned December visit.

¶14 Father's mother testified that she visited AMH three times in 2020. While AMH was with her during those visits, she would contact Father through FaceTime.

¶15 The trial court found that pursuant to 10 O.S.2011 § 7505-4.2(H)(1),(3), AMH is eligible for adoption without Father's consent because he "failed to maintain [a] substantial and positive relationship with the minor child."

¶16 Father appeals.

STANDARD OF REVIEW

¶17 "[A]doption without parental consent effects a termination of parental rights." In re Adoption of C.R.B., 1999 OK CIV APP 104990 P.2d 316In re Adoption of K.P.M.A., 2014 OK 85341 P.3d 38Id. ¶ 13.

ANALYSIS

¶18 "A parent's fundamental right to the care, custody, companionship and management of his or her child is a right protected by the United States and Oklahoma Constitutions." In re Adoption of M.A.S., 2018 OK 1419 P.3d 204In re Adoption of C.D.M., 2001 OK 10339 P.3d 802

I. Petitioners were Required to Present Clear and Convincing Evidence that Father's Consent is not Required.

¶19 Where a parent "fail[s] to consent to the adoption of a child, the petitioner must file an application to the court stating the reason that the consent or relinquishment of a parental right is unnecessary." M.A.S., 2018 OK 1Id. (quoting C.D.M., 2001 OK 103

H. 1. Consent to adoption is not required from a parent who fails to establish and/or maintain a substantial and positive relationship with a minor for a period of twelve (12) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for adoption of the child.

. . . .

3. For purposes of this subsection, "fails to establish and/or maintain a substantial and positive relationship" means the parent:

a. has not maintained frequent and regular contact with the minor through frequent and regular visitation or frequent and regular communication to or with the minor, or

b. has not exercised parental rights and responsibilities.

¶20 Because this statute is "in derogation of a biological parent's rights," it "must be strictly construed in favor of the biological parent." M.A.S., 2018 OK 1Id. "'Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established.'" In re Adoption of L.D.S., 2006 OK 80155 P.3d 1In re C.G., 1981 OK 131637 P.2d 66Id. (quoting C.G., 1981 OK 131

¶21 It is abundantly clear that the law required Petitioners to fully support their quest for termination of Father's parental rights with clear and convincing evidence to support their claim pursuant to § 7505-4.2 that he failed to maintain frequent and regular contact with AMH or failed to exercise his parental rights and responsibilities. As discussed below, we conclude they failed to meet this burden.

II. Petitioners failed to prove Father's consent was not required for the adoption of AMH. 

¶22 According to the record, Father's employment required him to spend 30 to 45 days offshore followed by 30 days onshore. The evidence also established that when Father was offshore, his ability to communicate by phone was limited due to the lack of cell phone service. There was conflicting testimony about Father's access to WiFi during his time offshore. Even by Mother's account, Father was able to FaceTime with AMH eight to ten times during the relevant time period. Mother also said she talked to Father by cell phone during this period, particularly regarding AMH's hospitalizations. She admitted that Father attempted to FaceTime on occasions she deemed inappropriate because of AMH's schedule and that she did not answer those FaceTime calls.

¶23 Father presented testimony that while he was offshore, he worked every day, on 12-hour shifts from either noon to midnight or midnight to noon. This serves to explain some of the timing issues with the FaceTime requests. Father also presented texts in which he asked why Mother did not answer his calls and she said she did not receive the calls. Father's mother testified that she visited AMH three times in 2020, and she and AMH communicated with Father by FaceTime while she was in Oklahoma with AMH. Mother and Father testified that Father came to Oklahoma to visit AMH in August 2020.

¶24 Petitioners argue that Father would like this Court to "remember his one in-person visit and his once-a-month calls, and give him credit for these as satisfying the bare minimum." They rely heavily on the case of In re Adoption of Baby A., 2006 OK CIV APP 24131 P.3d 153Id. ¶ 4. The mother presented evidence and testimony that the father (1) "contributed nothing to her support during her pregnancy, and had failed to fully comply with DHS support order;" (2) "had no personal contact with Child during Child's lifetime except for two brief visits, once in November or December 1999, and once in May 2002, when Mother, at her own expense, traveled with Child from Virginia to Oklahoma by bus so that Father could see Child while on leave;" (3) "never sent any cards, letters or packages between January 2001 and May 2002;" and (4) "had no contact or communication with Child after his May 2002 visit, although during the previous fourteen months, he had spent eight months on land, and had been provided with a free cell phone by the military." Id. ¶ 5.

¶25 The Court concluded:

The evidence in the present case clearly and convincingly demonstrated that Father took little, if any, interest in any contact or communication with Child since birth. During the last fourteen months prior to commencement of the instant adoption proceeding, Father was at sea for only six months, but made little or no effort to either contact or visit Child, or even to ascertain her whereabouts. Father's sole contact with Child over the preceding fourteen months was limited to one visit when Mother, at her own expense, traveled with Child by bus from her residence in Virginia to Oklahoma so that Father could see Child while on leave.

Id. ¶ 10.

¶26 Despite Petitioners' argument that Baby A. supports their position, even with the similarities of the fathers' situations in spending significant amounts of time offshore, it is clear that Father had much more contact with AMH than the father in Baby A. The evidence showed Father communicated with or attempted to communicate with AMH or Mother, on average, multiple times a month.

¶27 As to visitation, Father presented evidence that the COVID pandemic was responsible for at least one canceled visit. Although Petitioners would like us to totally discount the global pandemic during most of the relevant time period at issue, Father showed that the pandemic prevented him from visiting AMH on at least one occasion. In sum, Father's communication and attempts at communication with AMH far exceeded those deemed insufficient in Baby A.

¶28 And unlike the father in Baby A., Father met his paternal financial responsibilities to AMH. He never failed to contribute to AMH's support--Mother acknowledged that Father paid the required child support. Father presented uncontroverted evidence that he provided gifts to AMH for her birthday. Aside from testimony about Father's frustration over communicating with (a very young child--one to two years-old) AMH through FaceTime, Mother presented no evidence that Father's relationship with AMH was anything but positive.

¶29 Although we agree with Petitioners that the statutory language has changed since the Supreme Court's decision in In re Adoption of J.N.K., 2000 OK CIV APP 13215 P.3d 521

¶30 Our conclusion is further bolstered by the document AMH's attorney filed with this Court titled, "Attorney for the Minor Child's Statement in Agreement with the Appellant's Position." The document states that the attorney for the child "does not agree with or support the trial court's determination that A.M.H., is eligible for adoption and that it is not in the best interest of A.M.H. to be adopted by . . . Ballinger without [Father's] consent." The attorney further stated:

The Attorney for the Child would inform the Court that after having reviewed the Appellant/Respondent's Brief, as well as the Answer Brief of the Appellee/ Petitioner we concur with the argument and authority cited and laid out in said Appellant's Brief. The Attorney for the Child would not add any additional information, but would agree and maintain Appellant/Respondent's stance on the matter that the trial court's Orders were erroneous and that clear and convincing evidence did not support the trial court's rulings as to the eligibility for adoption without consent and the best interest of the minor child. Therefore, the trial court's ruling should be overturned for the reasons laid out in Appellant/ Respondent's Brief.

¶31 Given Father's well-established, constitutionally protected rights regarding his child, Petitioners confronted a high threshold to surmount, and after review of the record, we conclude they failed to cross that threshold.

CONCLUSION

¶32 For these reasons, we conclude the required clear and convincing evidence in support of Petitioners' petition is lacking. The decision of the trial court finding AMH is eligible for adoption without Father's consent is reversed.

¶33 REVERSED. 

RAPP, J., and BLACKWELL, J., concur.